

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 19, 2024**

United States Bankruptcy Judge

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| PM Management—Killeen I NC LLC, | § | Chapter 11 (Subchapter V) |
| et al., | § | |
| Debtors.[1] | § | Case No. 24-30240-sgj |
| | § | (Jointly Administered) |

### MEMORANDUM OPINION AND ORDER
### GRANTING IN PART AND DENYING IN PART THE AMENDED FIRST AND FINAL
### FEE APPLICATION OF GUTNICKI LLP

On October 1, 2024, the court held a contested hearing regarding the Amended First and

Final Fee Application of Gutnicki LLP (the "Gutnicki Final Fee Application"), DE # 251, seeking

approval of **$865,813.44** of fees and expenses, for roughly four-and-a-half months of

representation of the four "Subchapter V," Chapter 11 Debtors.[2] As further explained herein, the

---

[1] There are four Debtors in these administratively consolidated cases, and they are: PM Management—Killeen I NC LLC; PM Management—Killeen II NC LLC; PM Management—Killeen III NC LLC; and PM Management—Portfolio VIII NC LLC.

[2] The Final Fee Application pertains to time period from January 29, 2024 (the "Petition Date") through June 12, 2024. The fees sought are $839,020. The expenses are $26,793.44.

Debtors managed three senior nursing facilities ("SNFs"), one of which had an attached assisted living facility ("ALF). These facilities were in or near Killeen, Texas. These entities have been entangled in bankruptcy cases three separate times in less than six years.[3] A party-in-interest, HCK, LP, filed an objection to the Gutnicki Final Fee Application ("Objection") essentially arguing that the fees requested were *too much*—considering the size and complexity of these cases—and also arguing that Debtors' counsel and its client-representative had *conflicts of interest* with the Debtors' *non-debtor, indirect parent company* that further warranted a reduction in fees. After hearing the evidence and argument of the parties, the court took the Gutnicki Final Fee Application under advisement. The court deferred issuing this written ruling, in response to a communication from the lawyers to the courtroom deputy indicating that the parties were engaged in settlement discussions pertaining to the Objection. Later communications to the courtroom deputy indicated that those discussions were not fruitful. For the reasons set forth below, the court finds and is of the opinion that the Objection should be partially sustained. This court finds and concludes that the fees should be reduced by **$201,191.91** for the reasons set forth below.

## I.    FACTUAL BACKGROUND[4]

A. *The Subchapter V Cases in Which this Fee Dispute Arises*.

Because context always matters in any fee dispute, the court will attempt to briefly set the stage. As noted, this fee dispute arises in the context of four related and administratively consolidated Subchapter V, Chapter 11 cases (the "Sub V Cases"). The Debtors, at the time of the filing of the Sub V Cases, on January 29, 2024 ("Petition Date"), managed three SNFs, one of which also had a connected ALF—all of which are located in or near Killeen, Texas (collectively,

---

[3] The second time, only indirectly, as explained herein.
[4] This constitutes the court's findings of fact and conclusions of law in this contested matter, pursuant to Fed. R. Bankr. Proc. 7052 and 9014.

the "Killeen Facilities").  HCK, LP, the objecting party, is a successor-in-interest to the landlords

that were parties to a Master Lease on the Killeen Facilities (together, the "Hill Country

Landlord").  In other words, the Hill Country Landlord owned the actual land on which the Killeen

Facilities sit. The Master Lease for the Killeen Facilities was entered into with just one of the

Debtors—PM Management Portfolio VIII NC LLC—and it, in turn, entered into subleases with

each of the other three Debtors who were managing the Killeen Facilities.  As if this structure was

not complex enough, the actual operator with the operating license on the Killeen Facilities has

been, since June 1, 2022, Uvalde Memorial Hospital District ("Uvalde"), through the Texas "QIPP

Program"[5] (the QIPP Program helps facilities such as the Killeen Facilities get more money from

Medicaid, and it increases their revenue by a certain percentage based on being in the QIPP

Program).  Uvalde has its own sub-sublease on the Killeen Facilities and has three management

agreements with the three Debtor-managers.  Suffice it to say that there has been much friction

between the Debtors and the Hill Country Landlord.  For one thing, the Hill Country Landlord, as

of the Petition Date, had not been paid rent for more than one year (since December 2022), creating

for it an obstacle in paying its secured lender, KeyBank National Association, which—while it is

a lender to the Hill Country Landlord and not the Debtors, *per se*—happens to be secured by the

Killeen Facilities.  During this same time period of nonpayment of rent, the Debtors were not

submitting any operating reports to the Hill Country Landlord, as required by the Master Lease,

causing a concern about a lack of transparency.  Also, the Hill Country Landlord has endured three

bankruptcy cases involving the Killeen Facilities in less than six years.

    The First Bankruptcy.  In late 2018, Senior Care Centers, LLC ("Senior Care") and more

than 120 related entities filed Chapter 11 bankruptcy cases in this court, Case No. 18-33967.  This

---

[5] "QIPP" means Texas Quality Incentive Payment Program for Nursing Facilities established by HHSC and codified
at 1 Tex. Admin. Code § 353.1301-04, as amended from time to time.

was a very large and difficult case, involving more than $100 million of debt, including secured

debt of Senior Care's bank lender (CIBC), trade debt, landlord debt, tort debt, and more.  An

individual named Kevin O'Halloran served as the Chief Restructuring Officer ("CRO") throughout

the Senior Care bankruptcy.  Senior Care struggled mightily for months during its case, including

dealing with the following issues: cash flow obstacles resulting from slow paying and razor thin

profits from Medicaid and Medicare reimbursements; contentiousness with many landlords; a very

active Patient Care Ombudsman exploring and raising patient-care issues; and an active unsecured

creditors committee that was troubled by various prepetition management decisions, including a

decision to sell a pharmacy business and disburse proceeds therefrom to insider bridge lenders.

Senior Care eventually dramatically pared down its enterprise of more than 120 SNFs across

several states to only 22 of its best-performing facilities, all of which were in Texas. Senior Care

emerged from bankruptcy on March 27, 2020 (although there is a liquidating trustee still engaged

in implementing aspects of its plan).  The Killeen Facilities were among the 22 facilities that stayed

under the umbrella of the Reorganized Senior Care. After the effective date of Senior Care's

chapter 11 plan, the Reorganized Senior Care's newly issued equity was owned or acquired by a

newly formed entity called Abri Health Services, LLC ("Abri"). Specifically, Abri was

incorporated on December 31, 2019, to become Manager, Sole Member, and 100% owner of the

Reorganized Senior Care under its confirmed plan.

    The Second Bankruptcy.  Unfortunately, Senior Care, along with its new parent, Abri,

soon fell into financial distress again.  Less than 13 months after Senior Care's chapter 11 plan

went effective, it and its new parent Abri filed new chapter 11 cases (this time as Subchapter V

cases) (Case #21-30700, filed on April 16, 2021, administratively consolidated).  Apparently,

struggles during COVID-19, as well as problems with a landlord called "TXMS"—a landlord on

11 of the 22 facilities that were retained by the Reorganized Senior Care—precipitated this second filing.  Apparently, TXMS had terminated its own Master Lease on its 11 facilities, and the parties could not work out a consensual transition of those facilities outside of bankruptcy. Kevin O'Halloran (the CRO from the Senior Care case) was back for this new bankruptcy, this time as the Chief Executive Officer ("CEO"), not CRO, of both Abri and Senior Care.  The lead bankruptcy lawyer for Abri and Senior Care was Liz Boydston ("Boydston"), the same lead bankruptcy lawyer now in these current Sub V Cases—although she was then at the Polsinelli law firm and is now at the Gutnicki law firm.  Boydston had also been involved towards the end of the first Senior Care bankruptcy case (while at Polsinelli).  Kevin O'Halloran's first-day declaration in this second bankruptcy indicated that he had been brought in as CEO of Abri and Senior Care by some new investors, just a month before, in March 2021.  DE # 10.  There were two Board members of the Debtors, one of which was a new Independent Director recently brought in, Monica Blacker ("Blacker"). *Id.*  The Abri/Senior Care consolidated Subchapter V cases were relatively small in comparison to the earlier, massive Senior Care Chapter 11 case. The Debtors estimated they owed an aggregate of approximately $2,672,858.02 in unsecured trade debt;[6] they had no secured debt; and they had approximately $3,555,000 in total assets.  *Id.* However, things were definitely very contentiousness with the landlord TXMS.  After mediation that included the Subchapter V trustee, a plan was eventually confirmed in this second bankruptcy case in October 2021, and such plan went effective on July 7, 2022.

    The Third Bankruptcy.  Unfortunately, the saga continued with the filing of the current Sub V Cases approximately 18 months after Abri/Senior Care emerged from bankruptcy #2.  As noted

---

[6] Looking back at the Abri schedules, DE # 111 in Case # 21-30700, they listed just six general unsecured creditors, including TXMS relating to its master lease; they listed six taxing authorities; and they listed 17 executory contracts—of which one was the TXMS Master Lease.

earlier, these Sub V Cases involve only ***three of the remaining Senior Care enterprise facilities,***[7] that are each in or around Killeen, Texas (on which the Hill Country Landlord is the landlord for each). As of the Petition Date, the Debtors provided healthcare to approximately 290 patients and residents (they have capacity for 420 beds) at the Killeen Facilities (about a 65% occupancy level).

***Abri and Senior Care were not in bankruptcy this third time around***—just: (a) the Senior Care subsidiary that actually leases the Killeen Facilities; and (b) the three Senior Care subsidiaries that, in turn, sublease the Killeen Facilities and manage them (at least in part and/or at least according to contractual documentation). ***However, Abri has been prominently involved in these Sub V Cases***. First, to be clear, the four Debtors are 100% owned by Senior Care, which, in turn, is 100% owned by Abri. Thus, Abri is the indirect parent of these four Debtors. But besides being the indirect parent, Mr. O'Halloran testified at the hearing on "First Day Motions" in these Sub V Cases that it was his understanding that ***Abri*** had a management agreement or agreements with Uvalde,[8] pursuant to which Abri has provided to the Debtors a multitude of corporate services. As earlier indicated, the management agreements (there are three) are ***actually between the three sublessee-Debtors (not Abri)***, on the one hand, and Uvalde, on the other.[9] While this court believes from testimony that Abri provided corporate overhead and other services for the Debtors, the court has not been provided with an actual written agreement for that arrangement. It is easy to understand why a person might be confused by all of this—the structure is complex. In any event, Kevin O'Halloran was back for this third foray into bankruptcy. He was now acting as both CRO ***of Abri and of the four Debtors***. His Declaration in support of first day motions filed in this third set of bankruptcy cases stated that he "previously served as the CEO of Abri (and thus the

---

[7] To be clear, and as a reminder, one Killeen Facility has a separate SNF and ALF at different sections of the Killeen Facility.

[8] HCK Exh. A, Transcript of Hearing on First Day Motions, 2/5/24, DE # 265-1, at p. 122.

[9] *See* DE ## 180-2; 180-3; and 180-4.

Debtors) [his words] from March 2021 through March 2023" and was hired back "as CRO by Abri on January 12, 2024."[10]  DE # 33. Thus, Mr. O'Halloran was out of the picture, so to speak, for about ten months.  The Declaration further explains that the Abri/Senior Care enterprise had been trimmed down even further since their previous foray into bankruptcy.  This was because, on April 5, 2023, yet another landlord had filed a receivership (the "CHI/Slate Receivership) over *five* of the SNFs under the Abri/Senior Care umbrella ("CHI/Slate Facilities"), to which Abri consented, leaving the Abri/Senior Care enterprise now down to just *six* entities:  (a) the Debtors' *four* Killeen Facilities (remember this is actually three SNFs, and one with an attached ALF); plus (b) *two* other non-debtor facilities under the Abri/Senior Care group (one in Fredericksburg and one in Edinburg) .  Apparently, this CHI/Slate Receivership resulted in some serious cash flow problems for the Abri/Senior Care enterprise.  The O'Halloran Declaration states that the CHI/Slate Receiver owed Abri, as of the Petition Date of these new Sub V Cases, more than $2 million for corporate/management services Abri provided to the CHI/Slate Facilities during the time frame they were being transitioned.  But the cash flow problems for Abri were worse than just that $2 million of unpaid transition receivables.  Apparently, as a result of the CHI/Slate Receivership, Abri's and the Debtors' depository bank, CIBC, allegedly without notice to them, "halted daily sweeps from the Debtors' HUD Concentration Account, put post-no-debits, and mistakenly removed Abri's ability to access the Debtors' HUD Concentration Account through Abri's banking portal."  DE # 33, ⁋⁋ 15-17.  This apparently hindered Abri's ability to pay expenses at the Killeen Facilities and forced Abri to fund shortfalls (O'Halloran represented that, between May 2023 and December 31, 2023, Abri funded the Debtors' shortfalls, which amount totaled $1,236,830.62).  DE # 33 at ⁋ 17.

---

[10] The Declaration also indicates that O'Halloran is a Managing Member of Newbridge Management, LLC ("Newbridge").  DE # 33.

A further explanation of this "HUD Concentration Account" seems in order—because the facts have not seemed crystal clear to the court and, yet a loss of access to funds in the "HUD Concentration Account" in Spring 2023 seems to be a prominent explanation (from the Debtors' perspective) for the Debtors' and/or Abri's financial distress. As explained at the hearing on the "First Day Motions" in these Sub V Cases, there was a "HUD Concentration Account" at the Debtors' depository bank, CIBC (the former secured lender to Senior Care). The court notes that a chart attached to the Debtors' cash management motion, DE # 20, p. 21, shows the account holder for this HUD Concentration Account, # 7640, to be *the Debtor PM Management Killeen II NC LLC*. However, Mr. O'Halloran testified repeatedly at the hearing on First Day Motions as though it was *Abri's* account and, more pointedly, stated that all of "the HUD money" was actually *commingled revenue associated with all of the facilities in the Senior Care/Abri group, that had HUD-backed[11] loans on them,* which would later be swept to an Abri central treasury bank account, then used to pay expenses of the appropriate facilities. What does all of this mean? Many of the facilities in the former Senior Care/Abri enterprise had landlords that had HUD-backed loans. For example, as earlier noted, the Hill Country Landlord had secured loans from KeyBank National Association. These were HUD-backed loans. In connection with a HUD-backed loan, a HUD-backed lender such as KeyBank will enter into an Operator Security Agreement (the "OSA"), and certain related ancillary agreements. An OSA does not provide any borrowing or line of credit to the actual facility. Rather, an OSA provides a security interest on the facility to the lender, on behalf of HUD, for the HUD-backed loan provided to the *landlord*. While the HUD-backed lender may have no direct claim against the facility-entity (i.e., the tenant), *the OSAs grant a security interest in essentially all of the facility's assets, including cash, accounts, and*

---

[11] HUD refers to the U.S. Department of Health and Human Services.

*accounts receivable*, to secure full, prompt, and complete payment and performance of all obligations of the landlord under the HUD-backed loan. Thus, the creation of the HUD Concentration Account would be a mechanism to accommodate/facilitate this interest of the HUD-backed lender. Mr. O'Halloran testified that some of the funds in the HUD Concentration Account *actually related to the five facilities that were subject to the CHI/Slate Receivership*. During the CHI/Slate Receivership, there were disputes about the funds in this account. Eventually CIBC put a freeze on the HUD Concentration Account, in May 2023—apparently because of this CHI/Slate Receiver dispute. Shockingly, according to Mr. O'Halloran, the accounting team and executives at Abri had no idea what money was in this HUD Concentration Account between May 2023 and January 5, 2024 (they allegedly could not see into the account online, and, meanwhile, the balance therein was building handsomely). But, strangely, during this May 2023-December 2023 time period—at a time when Abri supposedly had no idea how much money it had in the HUD Concentration Account, and it was allegedly in a financial tailspin without access to the funds— Abri was in negotiations with the Hill Country Landlord to purchase the real property on which the Killeen Facilities sit (and, as earlier noted, it was not paying any rent to the Hill Country Landlord during this time frame). These negotiations fell through in December 2023. Then, suddenly on January 5, 2024, Abri asserts that it discovered for the first time, through its accounting team, that the HUD Concentration Account at CIBC contained **$7,449,745.58**. It's very hard to understand how Abri could be shocked—since it had not paid the Hill Country Landlords more than $5 million of arrearages during all of 2023. Then, on January 9, 2024, the Hill Country Landlord filed a lawsuit, No. 24DCV343679, in the District Court of Bell County, Texas, 146th Judicial District in the State of Texas (the "State Court") seeking damages for breach of the Master Lease and the appointment of a receiver, and a receiver was appointed hours later

over the Killeen Facilities ("Hill Country Receiver"), subject to the State Court's further consideration of the matter at an evidentiary hearing on January 24, 2024. The Receiver was appointed to, among other things, take possession and operate the Killeen Facilities, pay essential vendors, pay the secured lender, and otherwise maintain the status quo. The Hill Country Receiver gained temporary control of the HUD Concentration Account. Mr. O'Halloran was then brought back by Abri's "silent investor," a "Mr. Rubin," and re-hired as CRO *of Abri and the Debtors* on January 12, 2024. Less than two weeks later, on January 29, 2024, the Debtors each filed the Sub V Cases.   HCK Exh. A, Transcript of Hearing on First Day Motions, 2/5/24, DE # 265-1 (hereinafter "First Day Transcript"), at p. 40; 51-60.

In addition to the HUD Concentration Account situation, Mr. O'Halloran testified that he found things to be in a "desperate and dire situation" when he came on the scene and:

> The first thing I did was I terminated the then leadership team made up of two people.  One was titled CEO and the other was sort of a de facto CEO.  And then after that, another—a couple of people were terminated because of the fact that they were probably not needed.  And that came from consultation with the managers.

*Id.* at 42-43.   Abri, through Mr. O'Halloran, thereafter, engaged in attempts at resolving issues with the Hill Country Receiver.   These efforts proved unsuccessful (apparently mainly because the parties could not agree on what got paid out of the HUD Concentration Account and what did not), and Mr. O-Halloran contacted the Gutnicki firm about representation in a possible bankruptcy.  DE # 33, ¶¶ 24-35.  These Sub V Cases were filed soon thereafter.

The Debtors estimated that their prepetition debt was approximately $6.3 million, of which approximately $5 million was owed to the Hill Country Landlord for unpaid rent, maintenance charges, and taxes.  DE # 33, ¶¶ 46-48.

From the first hearing in these Sub V Cases, the Debtors represented that their intention was to transition the Killeen Facilities to the Hill Country Landlord or to an operator of its choosing. First Day Transcript, p. 15. There was no intention to attempt to work things out with the Hill Country Landlord and keep and reorganize the Killeen Facilities. ***Why, then, were they fighting the Hill Country Receivership?*** The Debtors' counsel represented that they were concerned about patient care, they were worried about the lack of health care expertise of the Hill Country Receiver, and they thought the transition process should happen in a bankruptcy case and not in the Hill Country Receivership. *Id.* ***Debtors' counsel represented that Abri was not itself put into bankruptcy because it had no money and had lots of contested debt (court query: isn't that a reason that most companies do file bankruptcy?), and they didn't think it would be economical overall to put Abri in bankruptcy.*** *Id.* at p. 16. On the contrary, the Hill Country Landlord argued that this third bankruptcy case was ***all about Abri*** and not the four Debtors—stating that the State Court Receiver was perfectly competent and had been fine with funding the operating needs of the Debtors—he just didn't want to fund ***Abri's full payroll*** or payables of Abri's ***non-debtor*** facilities (Fredericksburg or Edinburg—the testimony at the First Day Hearing indicated that Fredericksburg was losing money and could not pay any of its share of Abri's corporate costs and that Edinburg was at best break-even). *Id.* at 27-28; & 111. To this point, at the First Day Hearing, among the payroll that the Debtors asked to pay were approximately 31 employees of Abri, six of whom had already been terminated prepetition. These were employees who provided corporate services that were related to the whole Abri/Senior Care organization—including the two non-debtor facilities, Fredericksburg and Edinburg. *Id* at pp. 64-71. There were additionally more than 20 Certified Nursing Assistants that were technically employees of Abri that floated among the Killeen Facilities and the other non-debtor facilities. *Id.* at 72-77. Taking

the testimony of Mr. O'Halloran at face value, Abri normally would have simply been entitled to a 5% management fee from the Debtors, rather than direct reimbursement of all of Abri's payroll. *Id.* at 79.  At the First Day Hearing, it became clear that Abri was not seeking to be paid a 5% management fee during these cases.  Rather, it wanted to be reimbursed for most of its overhead— on the basis that it was necessary to avoid harm to the Debtors. *Id.* at 90.  These expenses amounted to much more than the 5% management fee. The Debtors were seeking to pay $355,915 of cash collateral to Abri at the First Day Hearing. Moreover, the Hill Country Landlord represented that prepetition, after the onset of the Hill Country Receivership, Abri was insisting on being paid $600,000 per month, for five more months, which would include continuing to manage Fredericksburg and Edinburgh. *Id.* at 166, line 17 through 168, line 8.

To be clear, the Hill Country Landlord was arguing conflicts of interest existed from the very beginning of these Sub V Cases, between Abri and the four Debtors.  The Hill Country Landlord represented that Abri had been refusing to provide management services to the Debtors prepetition at the compensation level set forth in the Debtors' Management Agreements (which would have been about $110,000—Mr. O'Halloran was insisting on more).  *Id.* at 28-29.  As a reminder, the Hill Country Landlord had not been paid by the Debtors since December 2022 and it had a secured creditor, KeyBank, to whom it owed millions, that was secured by these Killeen Facilities.  *Id.* at 30-31.  In summary, the Hill Country Landlord believed that the Sub V Cases had actually been filed for the benefit of Abri or, alternatively, it was inexplicable why Abri itself had not been put into bankruptcy. Many of the vendors to the Debtors were at the Abri level.  Many of the relevant contracts affecting the Debtors' operations were at the Abri level.  Abri was itself wanting money in the HUD Concentration Account for itself and for its two non-debtor subsidiaries, Fredericksburg and Edinburg (neither of which were "HUD" entities). Mr.

O'Halloran was hired to be CRO to both Abri and the four Debtors. Abri was owed $1.3 million by the Debtors, but Mr. O'Halloran announced Abri would not seek a claim for it. *Id.* at 154. Why—it's not as though Abri was itself was in bankruptcy and this would be an intercompany claim among debtors? And, while Abri apparently saw no need to file bankruptcy itself, it later removed its state court lawsuit with the CHI/Slate Receiver, to the bankruptcy court (through different counsel—not Gutnicki, although Gutnicki had recently been representing Abri in the CHI/Slate Receivership), making the argument that the claims in the CHI/Slate Receivership were related to these Sub V Cases—it was subsequently remanded by agreement of the parties. To be clear, the Debtors were not even parties in the CHI/Slate Receivership litigation.

Anecdotally, Abri received over $4 million in CARES Act funds in 2023, attributable to the Killeen Facilities that it used for the Killeen Facilities operations. *Id.* At the very least, there seemed to be an accounting morass among Abri and the Killeen Facilities. Why were these Killeen Facilities in such trouble (i.e., so behind with the Hill Country Landlord) if they had gotten that amount of government assistance in 2023—even in spite of the freeze on the HUD Concentration Account? All parties and, frankly, the court were quite confused after hearing testimony from Mr. O'Halloran at the hearing on First Day Motions. At one point, the court asked Mr. O'Halloran, "I don't understand why the debtor and Abri are in this situation. It sounds like they had a lot of cash flow coming in." *Id.* at 155, lines 23-25. Mr. O'Halloran responded as follow:

> THE WITNESS: So, Your Honor, when I left the company in March of last year [2023], we had approximately $16 million. We had no debt. We'd paid off the line of credit. And we had pending accounts receivable just from ERC alone of approximately $5 million and trade payables roughly at that time $3 million. So the company was very healthy and had a lot of money. Then the [CHI/Slate] receivership happened a month later [resulting in the loss of five facilities in the Abri/Senior Care group] and the company did not downsize. In fact, it increased the number of staff it had in clinical. It increased the wages of people that –

THE COURT:  It had two CEOs that were being paid an astronomical salary, it looks like to me, for this size entity. [There were co-CEO's of Abri:  one making $38,000 per month and one making $37,000 per month.  *Id.* at p. 44, line 23, through p. 45, line 8.][12]

THE WITNESS:  That's correct.

THE COURT:  You would agree with that?

THE WITNESS:  Yes, Your Honor, yes.  That's why both of them are gone, Your Honor.  Also, the chief clinical officer, his salary went from less than 200 or so to 350 in a short period of time.  And the salaries of others were similarly booted during this time.  There were numerous consultants who were brought in at enormous expense to the company.  And –

THE COURT:  And meanwhile the landlord isn't getting paid for a year.

THE WITNESS:  That's correct.  It was total mismanagement.  There's nothing else to say.

*Id.* at 156, line 4, to 157 line 3.

Counsel for the Debtors was adamant that the bankruptcy cases were filed to protect residents and "The reason we didn't put Abri in is because then it would be substantially more expensive because a Committee would come in.  And there's no money."  *Id.* at 173, lines 23-25. The court assumed this comment about a "Committee" coming in meant the total debt amount (if Abri was put into bankruptcy) would exceed the debt limitations for Subchapter V eligibility ($7.5 million at the time of the filing of these Sub V Cases).  As for any hint of a conflict of Mr. O'Halloran, counsel stated that, "He was retained by Mr. Rubin [an investor in Abri].  He doesn't owe any fiduciary duty to Mr. Rubin.  He's not here to do anything.  He's not even getting paid for this."  *Id.* at 172, lines 18-20.

The court allowed these Subchapter V Cases to continue, including letting the Debtors tap into the HUD Concentration Account (as well as other incoming accounts receivable in the case)

---

[12] For those who are math-challenged, that's $900,000 per year for CEO-salary for an enterprise with less than a dozen SNFs left.

to pay reasonable and necessary expenses—*with the primary focus, naturally, being the health and welfare of the residents at the Killeen Facilities*. To be clear, this was mostly KeyBank's cash collateral (except to the extent there were old, commingled funds from other HUD-properties, in the HUD Concentration Account, given the apparently loose accounting protocols in place). The Debtors ended up opening four new DIP bank accounts to clean things up a bit.  There were several agreed interim cash collateral orders.

The Hill Country Landlord filed a motion to dismiss the Sub V Cases, nine days after these Sub V Cases were filed, arguing bad faith.  DE # 66.  The parties agreed to continue a hearing on the motion to dismiss various times.  The motion argued:  (i) flagrant and improper conflicts of interest of the CRO, (ii) the Debtors' intent to obtain a tactical litigation advantage over the prepetition receiver in order to perpetuate and prolong a more costly transition of management services for the benefit of Abri and its owners, and (iii) the failure of Abri to file as a debtor in these Cases despite suffering its own financial distress and conflicts of interest with the Debtors and their operations.  The court was never asked to hear the evidence on this.  By March 28, 2024 (the 60-day mark in these Sub V Cases), the parties had found an entity to whom to transition the Killeen Facilities:  Touchstone Strategies Killeen.  This transition formed the basis for the Debtors' plan filed on March 27, 2024, DE # 134, as later amended (the "Plan"). The Hill Country Landlord agreed with the Debtors to put "pencils down" on the motion to dismiss, pending trying to resolve issues in these Sub V Cases through the Plan.  The Plan was a standard liquidating plan designed to (i) facilitate the transition of management services at the Killeen Facilities from Abri to Touchstone Communities, LLC ("Touchstone"), (ii) pay KeyBank in full in cash, and (iii) turn what was left in the Debtors' estates over to a liquidation trust (the "Liquidation Trust"), set up for the benefit of general unsecured creditors (*e.g.,* accounts receivable, cash, and causes of action).

It contemplated a 45-75 percent recovery to general unsecured creditors. The court notes, anecdotally, that only eight different claimants cast ballots (there were several duplicate ballots), by holders of $35,401.49 of claims. DE # 185, p. 6-7.

B.  *Other Case Professionals.*

In addition to the approximately $865,000 sought in the Gutnicki Final Fee Application now before the court,[13] there have, of course, been other costs of administration. Omni Agent Solutions, Inc. ("Omni") was retained as the claims, noticing, and solicitation agent for the Debtors in these Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim.  The Debtors' Liquidation Analysis attached to the confirmed Plan estimated that Omni's fees and expenses would be **$100,000**; that the Patient Care Ombudsman's fees and expenses would be **$30,000**; that the subchapter V trustee's fees would be **$40,000**; and that a tax advisor's fees would be **$20,000**.  To be sure, this is an expensive set of subchapter V cases, compared to the norm—more than $1 million of fees, in a situation:  (a) involving three SNFs and an ALF that mostly receive revenue from government programs, and had only a few trade creditors; (b) involving mostly just a dispute with a landlord, that had heretofore "hung in" with the Debtors through multiple bankruptcies, and also endured more than a year of nonpayment before the non-debtor parent Abri's "discovery" that there was more than enough money in a shrouded HUD Concentration Account to pay everyone; and (c) the Debtors' intended, from the beginning, to transition the Killeen Facilities to a new operator, in cooperation with the Hill Country Landlord.  While Mr. O'Halloran has sought no compensation from the Debtors, it has been represented to the court that he testified at the section 341 meeting that Abri has been paying him $100,000 per month, plus healthcare and other benefits (he was paid

---

[13] As later discussed herein, Gutnicki was paid $86,514 in the days leading up to the Petition Date, for its services in preparing the Sub V Cases for filing.

$80,000 per month for being CRO during the first Senior Care bankruptcy cases—where more than 100 facilities were involved).[14]

C.   *The Long-Pending Issues Concerning the Gutnicki Employment Application:  The Specter of Conflicts; the Supplemental Disclosures; the Prophylactics to Address Conflicts; the Belated Order.*

The timing of the filing of the Gutnicki Employment Application (and the objections thereto and slow resolution of those objections) was less than ideal.  The timeline was that the Petition Date was January 29, 2024.  Then, the Gutnicki Employment Application, seeking approval of its employment in these Sub V Cases *nunc pro tunc*, was filed 30 days later, on February 28, 2024.  *See* Loc. R. Bankr. P. 2014-1(b)(1) (deeming thirty days after retention as timely for an employment application).   An Order Approving the Gutnicki Employment Application, *nunc pro tunc*, was eventually presented and signed April 25, 2024—which was just four days before confirmation of the Plan, on April 29, 2024 (in other words, at a time when these Sub V Cases were practically concluded).  Why were things so protracted (besides the obvious fact that the employment application was not filed for 30 days)? The answer is mostly that there were ongoing concerns raised by the U.S Trustee and the Hill Country Landlord regarding Gutnicki's alleged conflicts that took weeks to resolve.

Starting with the Gutnicki Employment Application, it stated that:

> Gutnicki was retained to serve as corporate deal counsel to the Debtors on July 6, 2023. Between July 6, 2023 and December 31, 2023, the total amount of hours Gutnicki spent providing legal services to the Debtors was 69.47, which legal fees totaled $39,254.39. The Debtors never paid any of those legal fees, and as of December 31, 2023 the total outstanding amount remained $39,254.39. On January 22, 2024, Gutnicki was retained by Chief Restructuring Officer Kevin O'Halloran (the "CRO") to represent the Debtors as bankruptcy and restructuring counsel. Contemporaneously on January 22, 2024, Gutnicki waived the outstanding fees from its prior representation of the Debtors, which amount was $39,254.39.

---

[14] *See* DE # 157, ¶ 8; *see also* Case # 18-33967, DE # 2692.

The Gutnicki Emploment Application also stated that:

> Upon being retained by the Debtors to prepare these Cases in January 2024, Gutnicki received a retainer of $250,000, which retainer was paid by non-Debtor Marvin Rubin [majority equity owner of Abri]. No person, entity, party, representative, or agent of the Debtors or their non-debtor affiliates expects to or has requested to be repaid for the retainer. Gutnicki's fees and expenses related to the preparation of these Cases commenced on January 22, and were paid in full before the Petition Date. All of Gutnicki's fees and expenses incurred relating to these Cases prior to the Petition Date were paid in full, and Gutnicki holds the remaining amount of $163,486.00 in trust as a Retainer.

The Declaration of Boydston submitted in support of the Gutnicki Employment Application disclosed that on August 1, 2023, Boydston joined Gutnicki LLP as a partner, and the firm was, on the same date, retained by the Debtors' parent company, Abri, to assist Abri in the following described matters: (a) the aforementioned CHI/Slate Receivership (including an appeal therein); (b) the "Nexus Litigation" (which appears to be a matter pertaining to the Fredericksburg and Edinburg facilities); and (c) a "Future Care Consultants Demand" seeking a payment from Abri.

The Declaration of Boydston wraps up by representing that "the last time entry or expense entry logged by anyone at Gutnicki on behalf of any of the Abri Matters was December 31, 2023"; that "[n]o work was performed on behalf of any of the Abri Matters in 2024"; and, further, that when, in January 2024, Mr. O'Halloran contacted the firm to say he had been named CRO of Abri and all of its affiliates, including the Debtors, he instructed that "any prior engagements on behalf of any Abri entity should be deemed concluded and disengaged, that no funds were available for payment on outstanding invoices, if any, and that no legal work was to be performed on any matter by Gutnicki unless and until such time as the CRO specifically engages counsel."  Mr. O'Halloran subsequently asked if Gutnicki would waive the prepetition fees owed to it by the Debtor-entities (totaling $39,254.39) if he could "secure a $250,000 retainer for Gutnicki to represent the Debtors

in their receivership and, if necessary, as restructuring and bankruptcy counsel," and Gutnicki agreed, advising him that Abri might need separate counsel, and also making a recommendation of a firm if it came to that.  The court notes, anecdotally, that no firm has ever filed a notice of appearance for Abri in these Sub V Cases.  On an Exhibit 2 attached to the Declaration entitled "Disclosures," it stated that "In the past, currently, and in the future, Gutnicki LLP has represented, represents, and will continue to represent the following entities or affiliated entities in certain matters wholly unrelated to the Debtors and the Cases" and the following entities were among those listed:  Abri Health Services, LLC; Senior Rehab Solutions LLC; Senior Care Centers, LLC; PM Management-Fredericksburg NC, LLC; and SCC Edinburg, LLC.

First Supplemental Disclosure.  Fifteen days later, on March 15, 2024, Boydston filed a 3-page Supplemental Disclosure in support of the Gutnicki Employment Application.  DE # 124.  It elaborated regarding two aspects of the prior Disclosure.  It specified that, in connection with Gutnicki waiving its $39,254.39 prepetition unpaid fee claim against the Debtors, that it agreed with the CRO, Mr. O'Halloran, that special counsel would be brought in to represent Abri if any conflicts were to arise. The Supplemental Disclosure also elaborated that Gutnicki received the $250,000 Retainer, which was paid by Marvin Rubin (majority equity owner of Abri) and that "No person, entity, party, representative, or agent of the Debtors or their non-debtor affiliates expects to or has requested to be repaid for the Retainer. No conditions or promises were given in exchange for the Retainer (other than the agreement with the CRO to waive the $39,254.39)."  Additionally, the Supplemental Disclosure stated that "Gutnicki's engagement commenced on January 22, 2024" and that the "fees and expenses incurred in the seven (7) days Gutnicki was engaged prior to the Petition Date total $86,514" and that "$86,514 was paid in full before the Petition Date from the Retainer, and Gutnicki holds the remaining amount of $163,486.00 in trust as a retainer."

U.S. Trustee Objection.    On April 16, 2024, the United States Trustee objected to the Gutnicki Employment Application, DE # 160, on the grounds that the Boydston Disclosures established that Gutnicki attorneys had an ongoing connection with Abri, the Debtors' non-debtor parent, and they could not meet their burden to demonstrate there was no impermissible conflict of interest.

Second Supplemental Disclosure.    On April 17, 2024 (now more than two-and-a-half months since the filing of these Sub V Cases), Boydston filed a 10-page Second Supplemental Disclosure in support of the Gutnicki Employment Application.    DE # 170.    It was much denser with many more details regarding what Boydston did while at the Polsinelli firm, and then later at Gutnicki—as far as representation of Abri and Senior Care.    It also elaborated that no party had ever paid the $39,254.39 prepetition claim against the Debtors that Gutnicki waived.    It mentioned that the total amount of fees paid for Boydston's representation of Senior Care, Abri, and related entities in connection with the CHI/Slate Receivership in 2023 was $46,495 (which was paid via ACH payment on September 15, 2023, from an entity called Senior Rehab Solutions, LLC). While the numbers are somewhat hard to follow, it appears that in the six-month period between January 27, 2023 and July 31, 2023, the Gutnicki firm, overall, billed and received fees in the amount of $87,403.98 for its representation of Senior Care, Abri, and their subsidiaries involved in the CHI/Slate Receivership—which is represented to be "less than 1% of Gutnicki's clients, and none is a significant client of Gutnicki" or of Boydston individually.

Meanwhile, the Debtors' Motion to Approve an "Independent Manager."    Apparently, the Debtors, Abri, and the case professionals took note of the concerns of various parties regarding the specter of conflicts between the Debtors and Abri (not the least of which was the fact that the Debtors' CRO was also non-debtor Abri's CRO).    On April 2, 2024 (approximately 63 days after

the filing of these Sub V Cases), the Debtors file a motion for authority to appoint an independent manager of the Debtors (C. Ben Garren, Jr.), *nunc pro tunc*, to February 27, 2024. DE # 141.  The motion described that, on February 19, 2024, the board for Abri and the Debtors held a meeting to discuss the appointment of an independent manager for the Debtors and creation of a special committee with full control over the Debtors' Sub V Cases, for which the independent manager would serve as the special committee's sole member. The purpose of the independent manager and the special committee was to avoid any potential conflicts that may arise between the Debtors and Abri.  The motion indicated that multiple candidates were interviewed, and, on February 27, 2024, the board selected and appointed Mr. Garren to serve as independent manager and the sole member of the Special Committee. Mr. Garren had no health care experience but otherwise had an impressive resume, including being employed by the Coca-Cola Company for 24 years where he served as General Counsel, International, General Counsel, North America, and interim Chief Ethics & Compliance Officer among his several positions. Mr. Garren's primary responsibilities would be to review, analyze, and direct the Debtors on how to avoid potential conflicts with Abri. Mr. Garren agreed not to accept any compensation from the Debtors for his role as Independent Manager. The court approved this unopposed motion on April 25, 2024. DE # 199.

Court Ruling on Gutnicki Employment Application.  The court was ultimately presented with an Order approving Gutnicki's employment, *nunc pro tunc* to the Petition Date, on April 25, 2024. DE # 200.  The Order submitted was worded as though all parties were satisfied from the various disclosures (and perhaps from the Debtors' retention of the Independent Manager) that the specter of conflicts of interest had been resolved.  By this point, these Sub V Cases were near conclusion.  The Plan was confirmed in these Sub V Cases just four days later, on April 29, 2024.

D.  *The Gutnicki Final Fee Application (as Amended).*

The Gutnicki Final Fee Application requests compensation and reimbursement of expenses for their representation of the Debtors in the amount of **$865,813.44** for the period of January 29, 2024, through June 12, 2024. Within that total amount, Gutnicki requests fees in the amount of **$839,020** and reimbursement of expenses in the amount of **$26,793.44**. As earlier mentioned, Gutnicki received a prepetition retainer of **$250,000** from a majority shareholder of Abri, of which **$163,486** remained as of the Petition Date (and still remains in trust).  Gutnicki represents that it made a voluntary reduction of **$17,504.93** of its fees and **$1,007.33** of expenses for a total reduction of **$18,512.26** (not clear for what).  Sixteen timekeepers billed to the Debtors for a total of 1339.70 hours.  The largest billers were partner Boydston billing 402.90 hours at $875 per hours; counsel Max Schlan billing 438.80 hours at $650 per hour; and associate Alex Rahn, billing 215.70 hours at $550 per hour.   The notable fee categories were:

**Case Administration** $214,638.50

**Plan and Disclosure Statement** $216,905.00[15]

**Motion to Dismiss** $144,179.50

Additionally, the following separate billing categories that all seem to relate to the transition of assets contemplated from the beginning of the case:

**New Operator Transition** $52,607.50

**Asset Analysis & Recovery (NEW OPERATOR)** $9,100.00

**Asset Analysis & Recovery** $2,712.50

**Disposition of Assets (NEW OPERATOR)** $4,652.50

**Asset Sales and Other Disposition of Assets** $14,465.00

---

[15] There is, of course, no Disclosure Statement required in a Subchapter V case.

E. *Summary of the Hill Country Landlord's Objection.*

HCK, LP, successor to the Hill Country Landlord, filed its objection to Gutnicki's Final Fee Application, DE # 262, on September 11, 2024, complaining about the amounts sought as well as conflicts.

<u>With regard to the conflicts</u>, HCK LP's argument can be summarized as follows: there are extensive conflicts of interest between and among (i) the Debtors and Abri, (ii) Mr. O'Halloran serving as CRO for both the Debtors and Abri during these Sub V Cases, and (iii) Gutnicki, which previously served as counsel to both the Debtors and Abri in the months leading up to the Petition Date. HCK LP describes Abri, the non-debtor indirect parent, which shared a CRO with the Debtors and whose majority owner paid a $250,000 retainer to Gutnicki, as having a "parasitic" relationship with the Debtors.  HCK LP complains that Gutnicki and/or Boydston have haphazardly been representing Abri and its affiliates in their various financial debacles (*e.g.*, the prior Abri/Senior Care Subchapter V Chapter bankruptcy case and the multiple state court receiverships of 16 of their other managed facilities—the TXMS receivership and the CHI/Slate receivership—and even other matters involving its non-debtor SNFs in Fredericksburg and Edinburg) without regard to whether their interests are always aligned.  Moreover, HCK LP argues that, despite supplementing disclosures on multiple occasions at the insistence of the U.S. Trustee's Office, the Boydston Declarations were belated, incomplete, and opaque regarding the extent of the waiver of outstanding fees of Abri and other non-debtor affiliates as well as the extent of the connections to numerous insiders and parties in interest. It points to, among other things, evidence suggesting that Gutnicki continued to represent Abri and other non-debtor affiliates in the CHI/Slate Receivership in Texas state court for some length of time post-petition.  HCK LP Exh. C.  HCK LP argues that lack of disclosure in and of itself constitutes a basis to reduce or deny

attorneys' fees for violations of Bankruptcy Rule 2014(a), even where the lack of disclosure or conflict may not be deemed to be a disqualifying interest under the facts and circumstances. HCK LP contends that Gutnicki did not fully or timely disclose its connections to Abri and non-debtor affiliates and insiders of the Debtors. HCK LP notes that this duty to properly disclose includes "all of the person's connections with the debtor, creditors, any other party in interest, [and] their respective attorneys and accountants." Fed. R. Bankr. P. 2014(a). Specifically, it is alleged that Gutnicki, through its recent representation of Abri, participated in matters that affected the Debtors' ability to proceed in the present case. The Objection argues that these grounds are sufficient to justify a reduction in the awarded attorney's fees.

With regard to the allegedly excessive amounts sought, HCK LP claims that, besides filing a bankruptcy that perhaps never needed to be filed (since issues might have been resolved in the State Court receivership). Gutnicki chose, during the Sub V Cases, to "waste time and resources." As one example, it points to the amount of fees incurred by Gutnicki for certain applicable task codes *after* the March 28, 2024 Status Conference, at which the Debtors announced a likelihood of a consensual Plan with the support of the Hill Country Landlord with an agreeable new operator:

> **Task Code B175 Assumption/Rejection of Leases and Contracts ($6,430);**
> **Task Code B190A Motion to Dismiss ($26,907.50);**
> **Task Code B190 Other Contested Matters ($3,357.50);**
> **Task Code B310 Claims Administration and Objections ($3,916.00);**
> **Task Code B320 Plan and Disclosure Statement ($162,989.00).**

Total fees in these categories incurred after March 28, 2024 (when a consensual plan was said to be on the horizon—and one had been filed March 27, 2024): **$203,600.00**.

As another example, HCK LP Notes that the Debtors extensively litigated with HCK LP regarding reasonable governance requests HCK LP made concerning administration of the Liquidation Trust that was contemplated in the Debtors' Plan.

This issue deserves elaboration.  HCK LP had requested something fairly typical—that there be a Liquidation Trust Committee consisting of three members, two of which should be substantial creditors of the estates and beneficiaries of the Liquidation Trust. Any necessary consents, actions, or approvals should require the authorization of at least two of the three members of the Liquidation Trust Committee. In contrast, the Debtors proposed having just two members: (i) Ron Finch, the principal of the Former Landlords, and (ii) C. Ben Garren Jr., the Debtors' newly appointed Independent Manager (the individual who had come into these Sub V Cases late, to alleviate concerns about Mr. O'Halloran's conflicts, and had agreed to work for free during the Sub V Cases; the Debtors now proposed that C. Ben Garren Jr. should be the only member of the Liquidating Trust Committee compensated—and at a rate of $5,000 per month).  The Debtors also proposed requiring unanimous consent between Finch and Garren to, among other things, pursue and settle causes of action, retain professionals, and approve fees of any professionals.  In other words, Mr. Garren would effectively have blocking-power over these critical decisions.

The court finds this trust-governance issue to be particularly troubling.  Abri would be a prospective vendor to the Liquidation Trust, in the possible role of collecting the Debtors' remaining receivables post-confirmation (although Abri ultimately was not selected).  Abri also might have a target on its back for causes of action that could be brough by the Liquidating Trustee (*e.g.*, mismanagement of the Debtors—using O'Halloran's own word; taking more money out of the Debtors than perhaps contractually allowed, *etc.*).  Thus, Abri would appear to have a strong personal interest in the governance structure of the Liquidation Trust and the constitution of the Liquidation Trust Committee.  The fight over the governance issue appears to have been more about Abri than the Debtors, in this court's view.  Anecdotally, a retired bankruptcy judge (Russell Nelms) was chosen to be the Liquidating Trustee.

## II.       CONCLUSIONS OF LAW

### A.   *Conflicts.*

The Fifth Circuit has instructed that an analysis of conflicts of interest requires a "painstaking analysis of the facts and precise application of precedent." *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1256 (5th Cir. 1986) (citing *Brennan's v. Brennan's Restaurant, Inc.*, 590 F.2d 168, 173–74 (5th Cir. 1979)).  This is the reason the court has set forth 25-pages of factual background here.  Nothing about this analysis is easy or comfortable.  The Debtors and their relationship with Abri has been complex—and that is not *per se* unusual in the world of senior living facilities.  Senior living facilities often have landlords, sublessees, managers, operators, and other parties with whom there is interdependence (not to mention, government regulators). It is unfortunate that this industry is so complicated, since it is all about providing care to society's most vulnerable.  This court has frequently presided over healthcare cases with difficult landlords with above-market leases and knows that they can sometimes be a source of great difficulty for SNFs.  However, the court does not think that this was the problem here, with the Hill Country Landlords.  On balance, they seemed to have acted reasonably and with patience.

At bottom, while the Debtors and Abri had somewhat of a symbiotic relationship—in that the Debtors depended on Abri for certain management services and Abri depended on the Debtors for cash flow—the reality was that, by the time of the Petition Date (and the months leading up thereto) Abri seemed more dependent on the Debtors than *vice versa*.  The Debtors had survived long before Abri even existed (Abri only became an owner of the Senior Care enterprise in late March 2020), and the Debtors were agreeable to transitioning/selling their businesses by the time they filed bankruptcy. Abri, on the other hand, was in "dire straits" (using Mr. O'Halloran's words), by the time of the filing of these Sub V Cases and needed the Debtors to pay it ***more*** than

a market-normal 5% management fee, so Abri could sustain its two non-debtor properties (Fredericksburg and Edinburg) which were cash flow negative or, at best, break even. It seems to this court that Abri benefitted from slowing down the transition process a bit, through a Chapter 11 of the Debtors, so it could continue to be paid for managing the Debtors, while its non-debtor entities Fredericksburg and Edinburg continued to be unprofitable.

It seems obvious now why Abri was not put into bankruptcy. Abri mismanaged itself and the Debtors (using Mr. O'Halloran's own words). In Spring of 2023, it was flush with cash and had no debt—just a few months before the Debtors' bankruptcy cases. It had co-CEOs making $900,000 per year. It certainly appears, to any reasonable observer, that there were persons or entities that inappropriately drained capital out of this Abri/Senior Care enterprise (likely, a lot of it). By virtue of the Debtors' business model, these dissipated funds had to have been money from mostly government-funded programs (CARES Act, ERC, QIPP, Medicare, and Medicaid) that was intended to prop up companies in a troubled industry with vulnerable, elderly residents. Someone did not want Abri in bankruptcy and put under a microscope. The best anyone could hope for, for Abri, was for it to extract some more cash for itself through these Sub V Cases and then move on to focusing on other things.

Twenty-twenty hindsight is a tough thing. Maybe it might have seemed more constructive to the case professionals here to simply put the four Debtors into bankruptcy (as they did) and focus first and foremost on transitioning the Killeen Facilities without the sideshow of litigating against whomever mismanaged or extracted value out of Abri and/or the Debtors. But the fact is, there is a smell here of Abri running the show, until snooping eyeballs started calling it out. Abri's majority shareholder paid Debtors' counsel's retainer—this is not always problematic, but this court concludes it was problematic here, under these facts. And Abri somehow had the money to

27

pay Mr. O'Halloran $100,000 per month to be CRO of both the Debtors and Abri. How does one reasonably conclude that the simultaneous employment of a CRO by the Debtors and their non-debtor parent Abri—with the Debtors paying him $0 and Abri paying him $100,000 per month—was acceptable? The Debtors used this nonpayment-by-the Debtors arrangement as an excuse not to file an employment application for the CRO. Can any rational person assume he was completely loyal to the Debtors and not at all to Abri? Yes, an Independent Manager was brought in later in these Sub V Cases—but he was doing it *gratis*. He had no healthcare credentials. In hindsight, it looks like window dressing—a way to get someone potentially friendly to Abri on the Liquidating Trust Committee. These Sub V Cases—despite an ultimately smooth transition to a new manager, ended up being far more expensive than they ideally should have, because of the Abri-sideshow.

B. *Reasonableness and Necessity of Fees.*

HCK LP cites section 330 of the Bankruptcy Code which indicates that the court should consider whether all of Gutnicki's services and expenses were necessary. 11 U.S.C. § 330.

Section 330, of course, provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

In determining the amount of reasonable compensation to be awarded, the court should consider the nature, extent, and the value of such services, taking into account all relevant factors, including—

(a) the time spent on such services;

(b) the rates charged for such services;

(c) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(f) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

In determining the reasonableness of a professional's requested fee award, courts in the Fifth Circuit and in other districts have considered the following 12 factors articulated in *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714, 717 (5th Cir. 1974) (collectively, the "Johnson Factors"): (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Id. See also In re Caprock Wine Co., L.L.C.,* No. 09-50576-RLJ-11, 2010 WL 5376292, at *2 (Bankr. N.D. Tex. Dec. 23, 2010).

In theory, a Subchapter V case should be less expensive than a regular chapter 11 case. There is typically no unsecured creditors committee.  There is no requirement of a disclosure

statement to accompany a plan. There are no U.S. Trustee fees. There are tight deadlines, assuring a prompt trip through bankruptcy.

There is obviously no "cookie cutter" approach for all Subchapter V cases. These Sub V Cases involved: (a) regulated entities, (b) that are making generally small profits, (c) in an industry rebounding from COVID. As noted, SNFs involve vulnerable populations. Every party-in-interest must (and hopefully does) have, as their first priority, making sure no harm is done to the residents. The usual "leverage points" for Chapter 11 cases do not apply, such as the threat of closure or conversion. While the court appreciates that a case like this is going to be far more complicated and professional-heavy than something like a small retail business or apartment complex, this case was simply overworked, and at times, Abri's interests seemed to be prioritized over the Debtors'. If Abri had been put into bankruptcy, perhaps all concerns over conflicts could have been alleviated (among other reasons, there would have been transparency as to what went in and out of Abri and when, during the months before these Sub V Cases). But, since Abri wasn't—and it and its owners had funded the Debtors' case professionals (including the CRO), it caused a huge distraction and large, unnecessary fees. It is hard to put a dollar amount on this. However, the court has concluded as follows:

Half of the total fees in the following categories, incurred after March 28, 2024, were ***unreasonable and tainted by conflicts with Abri***, considering that a consensual Plan was on the horizon, as announced by Debtors' counsel on that date: Task Code B175 Assumption/Rejection of Leases and Contracts ($6,430); Task Code B190A Motion to Dismiss ($26,907.50); Task Code B190 Other Contested Matters ($3,357.50); Task Code B310 Claims Administration and Objections ($3,916.00); and Task Code B320 Plan and Disclosure Statement ($162,989.00). These fees totaled $203,600.00—thus half is $101,800. The fee request will be reduced by **$101,800**.

One-third of the fees in the Case Administration category ($214,638.50) seem unreasonable, given the size of these Sub V Cases—especially considering the number of creditors, the lack of complexity of those creditors' claims, and the fact that Omni was handling notice, service, claim, and plan solicitation at a tab of an estimated $100,000.  Thus, one-third is $71,546.10.  The fee request will be reduced by **$71,546.10**.

One-third of the fees in the following separate billing categories that all seem to relate to the transition of assets, that was contemplated from the very beginning of the case: New Operator Transition $52,607.50; Asset Analysis & Recovery (NEW OPERATOR) $9,100.00; Asset Analysis & Recovery $2,712.50; Disposition of Assets (NEW OPERATOR) $4,652.50; Asset Sales and Other Disposition of Assets $14,465.00.  These fees total **$83,537.50**—again, all seemingly related to the new operator transition. Meanwhile, fees related to the Plan were $216,905.00—of which the court already made some reduction above.  This $83,537.50, on top of $216,905 for plan-related time, seems unreasonably high, given that a transition was always in the works, and given that the new operator Touchstone and the Hill Country Landlord were more significant players in the transition than the Debtor-entities themselves.  The court believes it is reasonable to reduce this amount by one third—which would be another **$27,845.81** reduction.

It is therefore

**ORDERED** that Applicant is awarded on a final basis the total sum of **$664,621.49** ("Allowed Amount"), representing Allowed Fees in the amount of **$637,828.09** (reflecting a fee reduction of $201,191.91, as set forth above) and Allowed Expenses in the amount of **$26,793.44;** and it is further

**ORDERED** that Gutnicki LLP is entitled to draw down on its remaining retainer to make payment on the Allowed Amount and Russell Nelms, the Liquidating Trustee is authorized and directed to pay Gutnicki LLP the remaining Allowed Amount.

.

### End of Memorandum Opinion and Order ###