Andrew B. Ryan
Texas Bar No. 24054464
Sarah E. Long
Texas Bar No. 24143704
**RYAN LAW PARTNERS LLP**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
T: (214) 347-7377
F: (888) 594-6240
E: andy@ryanlawpartners.com
E: sarah@ryanlawpartners.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>PM Management-Killeen I NC LLC, *et al*,<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11 (Subchapter V)<br><br>Case No. 25-03049 (sgj)<br><br>(Jointly Administered) |
| Abri Care Group LLC; Sheryl Frankl, Individually and Derivatively on Behalf of Affinity Care Group LLC; Abraham Frankl; MR Acquisition, LLC; and Abri Health Services, LLC;<br><br>    Plaintiffs,<br><br>v.<br><br>Gutnicki LLP; Aharon S. Kaye; and Elizabeth Nicolle ("Liz") Boydston,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. _____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Sheryl Frankl (individually and derivatively on behalf of Affinity Care Group LLC), Abri Care Group LLC, Abraham Frankl, MR Acquisition, LLC, and Abri Health Services, LLC file this Original Complaint and allege as follows:

## I. INTRODUCTION

1.      Driven by greed, unbothered by conflicts of interest and attorney ethics rules, and chronically dishonest with the bankruptcy court, the lawyer defendants here contrived, implemented, and refused to abandon an unnecessary and unauthorized bankruptcy filing that caused the plaintiffs millions of dollars in damages.

2.      Since early 2022, Gutnicki LLP ("Gutnicki") represented Abraham Frankl and his various health care and real estate entities.  Aharon S. Kaye, a partner at the firm, repeatedly told Mr. Frankl that, regardless of the entities named, Gutnicki considered Mr. Frankl to be the firm's client, and that the firm would always act in Mr. Frankl's best interests.  For this reason, Mr. Frankl hired Gutnicki to work on several of his most important legal matters—including, relevant here, a plan for one of his companies, MR Acquisition, LLC, to acquire the Texas real estate on which several profitable skilled nursing facilities sat.

3.      Mr. Frankl was such a valued Gutnicki client, in fact, that it started a bankruptcy division based on his recommendation—which, sadly, precipitated the events that follow.  In mid-2023, a company ultimately managed by Mr. Frankl, Abri Health Services, LLC, was represented by Elizabeth ("Liz") Nicolle Boydston, then a bankruptcy partner at Polsinelli LLP.  One day, Ms. Boydston announced on a call with Abri that she had been abruptly fired from Polsinelli. Mr. Kaye, from Gutnicki LLP, was on this call as Abri's co-counsel.  He and Mr. Frankl then discussed if Gutnicki should hire Ms. Boydston to start its bankruptcy department, in part so she could continue to work on matters for Mr. Frankl's companies.   Mr. Frankl recommended

Ms. Boydston as a good attorney.  Shortly thereafter, Mr. Kaye called Mr. Frankl to tell him—before other partners at Gutnicki were even told—that Ms. Boydston would be joining Gutnicki to lead its new bankruptcy practice.

4.      Gutnicki's decision proved disastrous for Mr. Frankl.  In early 2024, Ms. Boydston pushed three Abri entities to file an unnecessary bankruptcy.  Upon information and belief, she did so out of a desire for Gutnicki to earn exorbitant fees as the debtors' counsel.  Despite claiming Abri would get separate counsel for the case, Ms. Boydston continued to advise Abri's board of directors, including warning against asserting a multi-million-dollar claim in the bankruptcy case.  Gutnicki also refused to help Mr. Frankl and MR Acquisition enforce their transaction documents with the landlord whose receivership had prompted Ms. Boydston to recommend bankruptcy.

5.      What's more, Ms. Boydston accomplished this unnecessary and unauthorized bankruptcy through repeated false statements to the bankruptcy court.  She swore under oath that Gutnicki had disclosed its representation of other entities connected to the bankruptcy.  It hadn't—Gutnicki never disclosed its representation of Mr. Frankl or MR Acquisition.  She swore under oath that Abri had conflicts counsel.  It didn't.  She swore under oath that Gutnicki had ceased representing Abri.  It hadn't.  On a call with Abri's board, Gutnicki said it would keep representing Abri in other matters and needed to guide the bankruptcy or else "Abri is going to get fucked." She swore under oath that Gutnicki had waived fees that would have conflicted it out of filing the bankruptcy.  It hadn't—Gutnicki kept the fees on its books and has tried to collect them from Mr. Frankl a dozen times since the bankruptcy ended, including just days ago.

6.      In the end, the only party who profited from this ill-advised bankruptcy was Gutnicki.  It made nearly $665,000 in fees and expenses pushing an unnecessary and conflicted bankruptcy.  And its conflicted and negligent advice cost Mr. Frankl, MR Acquisition, and Abri

millions.  Ms. Boydston's bankruptcy strategy started with companies worth roughly $14 million in liquidation value and ended with businesses worth nothing to their owners.  Gutnicki's destruction of this business value left plaintiffs with no choice but to file this lawsuit.

## II.  THE PARTIES

7.      Plaintiff Sheryl Frankl is an individual who resides in Brooklyn, New York.

8.      Plaintiff Affinity Care Group LLC is a Delaware limited liability company with its principal place of business in Brooklyn, New York.  Plaintiff Sheryl Frankl is the 50% owner of Affinity Care Group and brings this lawsuit both individually and derivatively on behalf of Affinity Care Group.

9.      Plaintiff Abri Care Group LLC is a Delaware limited liability company with its principal place of business in Brooklyn, New York.  Abri Care Group was the manager of Plaintiff Abri Health Services, LLC.  Abri Care Group, in turn, was managed by its manager, Abri Holdings, LLC.  Plaintiff Abraham Frankl is the manager of Abri Holdings LLC.

10.      Plaintiff Abraham Frankl is an individual who resides in Brooklyn, New York.

11.      Plaintiff MR Acquisition LLC ("MR Acquisition") is a Delaware limited liability company with its principal place of business in Brooklyn, New York.

12.      Plaintiff Abri Health Services, LLC ("Abri") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.

13.      Defendant Gutnicki LLP ("Gutnicki") is an Illinois limited liability partnership with its principal place of business in Skokie, Illinois.  Gutnicki may be served through one of its partners at its principal place of business, 4711 Golf Road, Suite 200, Skokie, IL 60076.

14.      Defendant Aharon S. Kaye is an individual who resides in Chicago, Illinois.  He may be served at 6833 N. Francisco Ave., Chicago, IL 60645, or wherever he may be found.

15. Defendant Elizabeth ("Liz") Nicolle Boydston is an individual who resides in Dallas, Texas. She may be served at 7522 Azalea Lane, Dallas, TX 75230, or wherever she may be found.

### III. JURISDICTION AND VENUE

16. This Court has personal jurisdiction over Defendants because they engaged in business in Texas. During the relevant time, Gutnicki had an office and at least one partner in Dallas, Texas. Mr. Kaye worked on Gutnicki legal matters in Texas, especially those matters for Plaintiffs. Ms. Boydston is a resident of Texas.

17. Venue is proper in this Bankruptcy Court pursuant to the Protected Party Injunction in the Confirmation Order. Under Article VIII, Section D of the confirmed chapter 11 plan, the Bankruptcy Court retained exclusive jurisdiction over any suit brought against a "Protected Party," the definition of which includes Defendant Gutnicki in its capacity as counsel to the Debtors. Plaintiffs have not yet determined whether they consent to the Bankruptcy Court's jurisdiction to adjudicate the disputes raised in this complaint on a final basis, and so do not consent to Bankruptcy Court jurisdiction at this time. Plaintiffs further reserve their rights for the disputes raised in the Complaint decided by a jury. Finally, the Plaintiffs reserve their rights under Article VIII, Section D of the confirmed chapter 11 plan, and applicable Fifth Circuit authority, to seek an order from the Bankruptcy Court directing this suit to proceed in another court. *See, e.g.*, *Matter of Highland Capital Mgmt., L.P.*, 132 F.4th 353, 359–60 & n.6 (5th Cir. 2025) ("although we have recognized that bankruptcy courts have some power to perform gatekeeping functions, they nonetheless do not have unrestricted power to protect non-debtors from liability via a pre-filing injunction," including debtor's or trustee's counsel); *id*. at 362 (too broad a "gatekeeper injunction" is "patently beyond the power of an Article I court under § 105.").

## IV.  FACTUAL ALLEGATIONS

### A.     The Frankl Engagement Agreement.

18.     Plaintiff Abraham Frankl owns and manages (both directly and indirectly) various real estate and health care companies.  His health care companies are primarily nursing home facilities or their related entities like assisted living facilities or skilled nursing facilities.  In this industry, nursing home facilities often operate on what is known as an OpCo/PropCo model.  One company owns the real estate—the land and buildings on which the nursing home facilities sit (the "PropCo").  Another company operates the nursing home facilities—providing the required services to residents of the care facilities (the "OpCo").  Mr. Frankl's entities are a mix of PropCo's and OpCo's.

19.     In 2022, Mr. Frankl engaged Gutnicki to represent him and his various real estate and health care companies.  The terms of that representation are governed by a signed engagement agreement dated March 21, 2022 between Gutnicki, on the one hand, and Mr. Frankl and his business partner, Marvin Rubin, on the other (the "Frankl Engagement Agreement").  The Frankl Engagement Agreement does not attach any additional terms and conditions; it does not set venue for any dispute in Illinois; and it does not contain an arbitration clause.

20.     The Frankl Engagement Agreement plainly states that it "shall extend to any such expansion" of Gutnicki's representation of Mr. Frankl, "including expansion of this engagement to include additional individuals or entities that are affiliated with or related to" Mr. Frankl or Mr. Rubin.

21.     The Frankl Engagement Agreement also states that it "may be terminated" by Gutnicki only "by written notice, subject on our part to applicable rules of professional conduct."

22.     Throughout 2022 and 2023, Gutnicki represented Mr. Frankl and his entities in various matters, including real estate purchases related to skilled nursing and other adult care or living facilities.

23.     One of the matters where Gutnicki represented Mr. Frankl refers to the "Finch Facilities." The Finch Facilities were PropCo's—landlords who owned real estate and buildings that were leased to OpCo's. Specifically, the Finch Facilities were the buildings and real estate of three skilled nursing or nursing home facilities in Central Texas—Hill Country Rehab and Nursing Center in Copperas Cove, Texas; Indian Oaks Living Center in Harker Heights, Texas; and Rosewood Retirement Community in Killeen, Texas. Gutnicki and Mr. Frankl called them the "Finch Facilities" because they were managed by Ron Finch, who represented the various Texas limited partnerships that owned this real estate. As discussed below, they were also referred to in later bankruptcy proceedings as the "Killeen Facilities."

24.     Another of Mr. Frankl's related companies, Plaintiff Abri, managed the OpCo's for each of the Finch Facilities. Thus, the Finch Facilities, as the PropCo and landlords, were charging monthly rent to the OpCo's owned by Abri, which were the tenants.

25.     In August 2023, based on Gutnicki's advice and assistance, Plaintiff MR Acquisition (an entity formed, operated, and managed by Mr. Frankl) signed a Letter of Intent for the Finch Facilities (the "Finch LOI"). Importantly, MR Acquisition did not have a separate engagement agreement with Gutnicki; its representation was covered by the Frankl Engagement Agreement, as was work Gutnicki performed for similar facilities in Fredericksburg and Edinburg, Texas, and Andover, New Jersey.

26.    Under the Finch LOI, MR Acquisition would buy the Finch Facilities from their PropCo's in exchange for cash consideration of approximately $3.2 million.  Of that $3.2 million, MR Acquisition paid $1.3 million into escrow upon the signing of the Finch LOI.

27.    Importantly for Abri and its OpCo's, the Finch LOI also required the landlord at the Finch Facilities to cap the rent due to the PropCo's at the monthly debt service on the PropCo's mortgage.  Stated another way, the Finch LOI significantly reduced the rent owed by Abri and its OpCo's to their landlord.  This reduced rent would stay in place until the parties closed their final transaction.

28.    But Gutnicki's negotiation of the Finch LOI contained a significant mistake. In addition to reducing the rent due to the Finch Facilities until the closing, MR Acquisition needed the Finch Facilities to waive any allegedly past due rent owed by Abri and its OpCo's—*i.e.*, the difference between the Finch Facilities' debt service and the OpCo's monthly rent payments. Otherwise, if the deal fell apart, the PropCo could claim that the OpCo's had defaulted by underpaying their rent for months.  Gutnicki knew that this waiver was an important term to MR Acquisition; after all, the waiver was included in drafts of the final purchase agreement. But Gutnicki did not include it in the Finch LOI.

29.    The Finch LOI targeted a closing date of October 31, 2023.  Gutnicki therefore spent the summer and fall of 2023 working on the final purchase documents.

30.    By November 2023, however, questions had arisen about Ron Finch's authority to consummate the transaction.  As his lawyers (including Defendant Kaye) worked with Finch's counsel, Mr. Frankl pleaded with Gutnicki "to please follow up and get this executed."  But by December 2023, the parties had not signed a final purchase agreement that would have waived the

rent owed by Abri's OpCo's on the Finch Facilities. And just one month later, Gutnicki's errors would cause tremendous economic damage to Mr. Frankl, MR Acquisition, and Abri.

**B.      The Abri Engagement Letter and Liz Boydston.**

31.      By mid-2022, Plaintiff Abri had also engaged Defendant Liz Boydston, then an attorney at Polsinelli LLP, to represent it in various bankruptcy and receivership matters. Ms. Boydston's professional history reads like a lawyer with trouble generating a significant and stable book of business. Since becoming a partner at various large law firms, she has bounced from firm to firm (it appears involuntarily), unable to secure long-term employment.

32.      In January 2023, Mr. Frankl asked Defendant Aharon Kaye at Gutnicki to work on a matter that would ultimately involve Ms. Boydston and Polsinelli LLP. Plaintiff Abri therefore signed an engagement agreement with Gutnicki (the "Abri Engagement Agreement"). The Abri Engagement Agreement covered a matter referred to inside Gutnicki as the "Lit BK Appeal." Importantly, this was just one of several matters in which Gutnicki represented Abri. There were other matters, like the Jurca Litigation and WCK Compliance, among others, where Gutnicki represented Abri without any engagement letter.

33.      About three months later, Mr. Kaye at Gutnicki began working closely with Ms. Boydston at Polsinelli LLP on the Lit BK Appeal. During this same time period, Gutnicki continued to represent Mr. Frankl and his other entities (including MR Acquisition) in unrelated matters, like the Finch Facilities matter.

34.      Around the time of the Finch LOI, however, Ms. Boydston was fired from Polsinelli LLP. She learned of her firing while on a call with Mr. Kaye on an Abri-related matter. She described her firing to Mr. Kaye, Tina Hecht (then the CEO of Abri), and others on the call as "sudden" and "abrupt." Upon information and belief, Polsinelli LLP terminated Ms. Boydston

due to her inability to generate the business required of a partner at a large law firm.  Plaintiffs also allege, upon information and belief, that Abri's retainers to Polsinelli LLP, totaling $700,000, were a substantial part (if not a majority of) Ms. Boydston's annual billings at the firm.

35.     Mr. Kaye saw Ms. Boydston's firing from Polsinelli LLP as an opportunity.  The two already shared a key client (Mr. Frankl) and the business that he and his companies would generate.  Gutnicki also wanted to open a bankruptcy department.  Gutnicki had served nearly every aspect of the nursing home industry, but it did not have a bankruptcy practice.  Adding Ms. Boydston would fill that gap.

36.     Mr. Kaye asked Mr. Frankl what he thought about Gutnicki hiring Ms. Boydston.  Mr. Frankl strongly endorsed Ms. Boydston.  Ultimately, Gutnicki chose to hire her to open its bankruptcy practice and its Dallas, Texas office.  Indeed, Mr. Kaye told Mr. Frankl that Ms. Boydston would be joining Gutnicki even before the other partners at Gutnicki were informed about the firm's decision.

37.     Ms. Boydston then joined Gutnicki in August 2023, the same month as the Finch  LOI.  Both as a practical and legal matter, the knowledge of all the lawyers at Gutnicki (including Mr. Kaye) was imputed to their new partner, Ms. Boydston, and vice versa.

38.     In late 2023, as Gutnicki continued representing Mr. Frankl, MR Acquisition, and Abri in various matters, Mr. Frankl was instructing that Gutnicki's invoices be timely paid.  For example, in about November 2023, after being told Gutnicki was asking for payment of approximately $300,000 in invoices, Mr. Frankl authorized immediate payment by Abri of $100,000, with future payments coming shortly thereafter.  This payment schedule was consistent with his history at Gutnicki.  Then, beginning on January 9, 2024, everything started falling apart.

**C. The Finch Facilities Sue Abri's OpCo's and Gutnicki Refuses to Help its Clients During their Emergency.**

39.     Abri had been having difficulty with dwindling cash reserves until, on January 8, 2024, Judah Zutler, a consultant who worked with Abri personnel, relayed to Mr. Frankl that the issue—a complex banking problem—had been identified.  Amazingly, Abri's controller had discovered approximately $7.4 million in cash which, after working with its bank to correct the error, should have been available for the company's operations.

40.     The next day, January 9, 2024, Mr. Frankl and Marvin Rubin met with Mr. Zutler to discuss Abri's financial position.  The company had approximately $8 million in cash and $9 to $12 million in accounts receivable.  A rough calculation therefore placed Abri's liquidation value at over $14 million.

41.     Unbeknownst to Mr. Frankl, however, the Finch Facilities had sued Abri and its OpCo's in Bell County on the morning of January 9, 2024.  At 10:01 A.M. Central Time, the Finch Facilities filed their Original Petition and Application for Appointment of Receiver.  At 1:59 P.M. Central Time, the district court entered the Order Appointing Receiver.  Ironically, this was almost the exact time that Mr. Frankl and Mr. Rubin were calculating Abri's liquidation value at over $14 million.

42.     At 7:22 P.M. Eastern Time, Mr. Frankl received a call from Judah Zutler that a receiver had been appointed over the three Abri OpCo's operating at the Finch Facilities— PM Management – Portfolio VIII NC, LLC; PM Management – Killeen I NC, LLC; PM Management – Killeen II NC, LLC; and PM Management – Killeen III NC, LLC (collectively, the "Killeen Facilities").

43.    The appointment of a receiver was an emergency.  Just minutes after receiving the call from Mr. Zutler, Mr. Frankl sent Mr. Kaye a message on WhatsApp attaching the Order Appointing Receiver.  Mr. Kaye did not immediately respond.

44.    Three minutes later, Ms. Boydston emailed around a copy of the Order Appointing Receiver, claiming that she received no notice of it.  It is unclear, however, when on January 9, 2024, that Ms. Boydston learned about the receivership over the Killeen Facilities.

45.    After no response from Mr. Kaye for over a half-hour, Mr. Frankl again messaged him on WhatsApp: "This is an emergency."  Mr. Frankl also called Mr. Kaye's colleague, Mr. Aaron Rokach, and told him he needed Gutnicki's advice as soon as possible.  Only then did Mr. Kaye respond, suggesting that Gutnicki could talk to Mr. Frankl after 11:30 P.M. Eastern Time.  Mr. Frankl again pleaded: "I really hope so—and that this can be addressed 1st thing tomorrow morning."

46.    On the evening of January 9, 2024, at 11:35 P.M. Eastern Time, Mr. Frankl held a conference call with Gutnicki for nineteen minutes.  Defendants Mr. Kaye and Ms. Boydston, and non-party Aaron Rokach (the transactional lawyer) were on the call for Gutnicki.  On the call for Mr. Frankl and his entities were Mr. Frankl, Judah Zutler, and Ephraim Diamond and Barry Dershowitz, the two members of Abri's board.

47.    Although the call was expected to focus on the strategy for responding to the receivership obtained by the Finch Facilities, Gutnicki (especially Ms. Boydston) focused on the alleged non-payment of approximately $300,000 in invoices by Mr. Frankl and his entities. Mr. Frankl was confused, as he had authorized payments to be made in Gutnicki starting in November 2023.  Regardless, Mr. Frankl again agreed to pay Gutnicki its outstanding invoices.

48.     This conversation (and later calls and communications that evening with Mr. Kaye and Mr. Rokach) then turned to two strategic decisions involving Gutnicki.

49.     *First*, MR Acquisition wanted its approximately $1.3 million in escrowed funds from the Finch LOI returned as soon as possible. If the Finch Facilities did not intend to complete a definitive purchase agreement, then MR Acquisition was entitled to have its money returned. To state the obvious, these funds would have been more than enough to satisfy Gutnicki's alleged $300,000 in unpaid invoices.

50.     *Second*, Gutnicki proposed a plan to attack the receivership, which involved either putting Abri and its OpCo's (the Killeen Facilities) into bankruptcy, or threatening to do so. About ninety minutes after Gutnicki's conference call with Mr. Frankl and his team ended, Mr. Kaye and Ms. Boydston proposed an outrageous budget for an Abri-led bankruptcy. Gutnicki asked for retainers totaling $6.5 million from Mr. Frankl and Abri—a retainer of $3.5 million for any bankruptcy; a retainer of $1 million for the receivership over the Killeen Facilities; and a retainer of $2 million for Force10, a financial advisory firm that would supposedly aid with any bankruptcy.

51.     On top of the financial benefit it would receive, Gutnicki also conceived of these retainers to obstruct the receiver from completing his work. If Abri's money were in Gutnicki's trust account, then the receiver could not get it, so Gutnicki would either keep the money for its own benefit or simply to shield it from a duly appointed officer of the court. Either way, Gutnicki wanted Abri's money quickly because, as Ms. Boydston noted: "When the receiver comes in tomorrow, the first thing they'll want is the bank records."

52.     The next morning, on January 10, 2024, Mr. Frankl began working on getting Gutnicki paid and re-asserting control over Abri's money.

53. Around 10:50 A.M. Eastern Time, however, Mr. Frankl learned that Abri could no longer access the roughly $7.4 million that Abri's controller had discovered two days earlier. Instead of being in an Abri-controlled account, the money remained trapped in Abri accounts in the name of the Killeen Facilities, so the receiver had was able to wrongfully assert control over them. Five minutes later, Mr. Frankl called Mr. Kaye, who did not answer. Seven minutes after that, Mr. Frankl texted Mr. Kaye: "anyway [sic] we can discuss in the next ½ hr?? this is an emergency." Nearly an hour later, after still receiving no response from Mr. Kaye, Mr. Frankl again urgently texted him: "please!"

54. At 11:47 A.M. Eastern Time, Mr. Frankl had a twenty-two-minute conference call with Gutnicki. On the call for Gutnicki were Mr. Kaye, Mr. Rokach, and firm founder Abraham Gutnicki. Despite this being Mr. Frankl's first communication with Mr. Gutnicki, it was the firm's namesake who led the call for the Gutnicki team. He explained that Gutnicki now refused to receive funds transferred into its trust account. Mr. Gutnicki was concerned about the liability his firm might incur if it accepted money that could be subject to a receivership. This, of course, was a complete reversal from Mr. Kaye's and Ms. Boydston's proposal—made just hours earlier—that over $6 million be wired to Gutnicki's trust account before the receiver could exercise control over it. Moreover, Mr. Gutnicki demanded that Mr. Frankl pay all outstanding invoices and wire an additional $250,000 immediately.

55. Gutnicki's actions increased the urgency of obtaining the $1.3 million that MR Acquisition had escrowed under the Finch LOI. Release of the escrowed funds required working with the escrow company (Madison Title) to confirm the correct account into which the money should be transferred. As one option, Mr. Frankl asked that the money be transferred to Gutnicki's trust account, where it could then be used to pay Gutnicki's invoices. Gutnicki again

refused, even though the receiver had no claim to this money.  Mr. Frankl then asked for Gutnicki's help to have it transferred to another entity (and Gutnicki client), Fredericksburg Acquisition, LLC, and told the firm he would then cause this entity pay all outstanding invoices.

56.     At first, Gutnicki agreed to help MR Acquisition with its issues related to assigning the Finch LOI, including a strategy that would have effectively ended the receivership immediately.  Then Aaron Rokach, the transactional lawyer, spoke to Mr. Kaye, who told him the firm "isn't letting [Rokach] take further steps without resolving the balance issues."

57.     Besides being nonsensical, Gutnicki's position was unethical.  Its own engagement contract—the Frankl Engagement Agreement—states that it cannot withdraw from representing Mr. Frankl or his entities without giving written notice, which it never did.

58.     The Frankl Engagement Agreement also says that Gutnicki may not withdraw from representing Mr. Frankl unless its withdrawal complies with the "applicable rules of professional conduct."  The rules of professional conduct do not allow a lawyer to withdraw for non-payment of fees unless the client "has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled."  TEX. R. PROF'L CONDUCT 1.16(b)(5).  Gutnicki gave Mr. Frankl no such notice, much less reasonable notice.

59.     Moreover, a lawyer may not withdraw unless "withdrawal can be accomplished without material adverse effect on the interests of a client."  TEX. R. PROF'L CONDUCT 1.16(b)(1).  Here, Mr. Frankl was facing a true emergency—Abri's OpCo's were being taken over by a receiver sought by a landlord who had reneged on a deal that Gutnicki had negotiated.  But the firm refused to help him get money that would both get Gutnicki paid and allow Mr. Frankl to begin fighting the landlord.

60.     Gutnicki's actions left Mr. Frankl with few options.  He spent much of the next few days discussing with his colleagues and partners how to address these issues.

61.     Three business days later, when Gutnicki had not heard back from Mr. Frankl, Gutnicki sought to salvage the relationship between the firm and Mr. Frankl.  On January 15, 2024, Aaron Rokach wrote his colleagues at Gutnicki and Mr. Frankl to propose a "make-up" call: "All, looks like things have been moving in an unfortunate direction between our groups.  We wanted to have a call with everyone on this email together, to try and maintain a constructive path."

62.     Within days, however, Gutnicki would once again choose its own financial interests over its obligations to Mr. Frankl and his entities.

### D. Under False Pretenses, Gutnicki Files an Unauthorized and Ill-Advised Bankruptcy for the Killeen Entities.

63.     Four days after the make-up call, Gutnicki and Defendants Mr. Kaye and Ms. Boydston held a call with Abri board members Barry Dershowitz and Ephraim Diamond and Abri's new Chief Restructuring Officer, Kevin O'Halloran.  Ms. Boydston led the call for Gutnicki.  The call disclosed that Mr. O'Halloran, a long-term friend and referral source for Ms. Boydston, had reached out to Gutnicki to discuss a bankruptcy filing for the Killeen Entities. As discussed in detail below, Ms. Boydston also began threatening Abri's board that they would have personal liability if the Killeen Entities (and perhaps Abri itself) did not file bankruptcy.

64.     At this point, it should be clear to anyone with a calculator that Ms. Boydston's desire for a bankruptcy filing put Gutnicki's financial interests above those of its clients.  At most, the Finch Facilities were entitled to less than $500,000, since the Finch LOI reduced the rent owed between signing and closing, and the Finch LOI had never been terminated.  But even accepting the landlord's incorrect claim in full, Abri's OpCo's would have only owed roughly $4.4 million in rent.  There were no other significant unpaid trade creditors, and certainly none in default.

65.     On the other hand, Abri and its OpCo's had approximately $8 million in cash in Abri accounts, and access to another roughly $1.3 million in escrow at Madison Title, for a total of approximately $9.3 million in cash.  Thus, anyone would realize that the landlord of the Finch Facilities could be paid in full without the need for a bankruptcy.  The only parties who stood to gain from the bankruptcy were Gutnicki, which would be paid exorbitant fees as the debtors' counsel, and Ms. Boydston, who would have generated this lucrative engagement for her firm.

66.     So, Ms. Boydston recklessly marched ahead.  On January 22, 2024, she held a call with Abri's two board members, Mr. Diamond and Mr. Dershowitz.  On that call, Ms. Boydston threatened the board that their fiduciary duties were owed to the Killeen Entities' creditors, not its shareholders, so they could be sued if the companies did not file for bankruptcy.

67.     That was both legally and factually false.  Legally, Abri is a Delaware limited liability company.  And Delaware law does not allow creditors to sue directors for breach of fiduciary duty:

> Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation.  To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors.  Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation.  Accordingly, we hold that individual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors.

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (emphasis in original).  Factually, the Killeen Entities were not insolvent.  Indeed, the Killeen

Facilities later filed a consolidated balance sheet in their bankruptcy cases showing their assets exceeded their liabilities by almost $1.3 million.

68.     Regardless, Ms. Boydston's fearmongering worked.  Upon information and belief, one or more of the Abri board members will testify that they were very hesitant about a bankruptcy filing but felt bullied into signing an authorization for the Killeen Facilities to file for bankruptcy based on Ms. Boydston's advice.  In the end, however, the board members signed—but without the consent of the equity holders of the Killeen Facilities.

69.     The details of the board member's consent are important because they formed the basis of Gutnicki's understanding that it had the authority to put the Killeen Entities into bankruptcy.  And, as Gutnicki would soon disclose, its understanding was wrong.

70.     According to the Unanimous Written Consent of the Board of Directors of Abri Health Services, LLC, dated January 23, 2024, the board members of Abri (Mr. Dershowitz and Mr. Diamond) also comprised "the board of each of the Company's subsidiaries."  On this basis, Abri's board purportedly authorized the filing of "voluntary petitions for relief for the Company [Abri] and/or the Company's subsidiaries," and to retain Gutnicki to help with these filings.

71.     Six days after receiving the supposed board authorization, and after constant pressure from Ms. Boydston, on January 29, 2024, Gutnicki filed voluntary bankruptcy petitions for each of the Killeen Facilities.

72.     On February 7, 2024, the landlord of the Killeen Facilities moved to dismiss the bankruptcy on the grounds of conflict of interest—namely, that the Killeen Facilities and its professionals (including Gutnicki) were acting not in the debtors' best interest, but in the best interests of Abri.

73.     The next day, Gutnicki held a call—led by Ms. Boydston, who was joined by Mr. Kaye—with the Killeen Entities' alleged directors, Mr. Dershowitz and Mr. Diamond, who were actually Abri's directors. Plaintiffs have obtained a recording of that telephone call. Its contents are astonishing.

74.     To start, Ms. Boydston admits, unequivocally, that "Abri, by definition, has a claim against the Debtors." However, she proceeded to tell Abri's directors that they should not file a claim because that would not be in Abri's best interests. She continued advising them about what Abri should do even after they told her that Abri's board was at "an informational disadvantage" to Ms. Boydston and was therefore relying on her advice.

75.     According to Ms. Boydston, Abri should not file a proof of claim in the Killeen Facilities' bankruptcy case for two primary reasons.

76.     *First*, she said: "if we don't stay in bankruptcy, Abri is going to be fucked." According to Ms. Boydston, the Finch Facilities' motion about "conflicts, conflicts, conflicts" could result in the bankruptcy case being dismissed. And although she admitted "there is technically a conflict," she claimed allegations of a conflict were overblown—that it was all "state court litigator bullshit" filed by a "dirty state court lawyer," an apparent reference to the Finch Facilities' lawyers at Munsch Hardt Kopf & Harr, P.C.

77.     And while Abri having separate counsel enter the bankruptcy case could help with the conflicts questions, Ms. Boydston advised this was not in the best interests of Abri because "the first thing that a judge is going to say is 'what's your retainer, who paid it, and if it was Abri, how can Abri afford a lawyer when Abri can't even afford to pay its own debts?'" According to Ms. Boydston, if Abri hired separate counsel, then "all money currently going to Abri [from the bankruptcy case] stops," which would be harmful because Abri was being "propped up" because

"we" (Gutnicki) "won" first day motions in the bankruptcy case allowing the Killeen Facilities to pay Abri.

78.     *Second*, Ms. Boydston claimed there would be no benefit to Abri filing a proof of claim because—as she repeatedly said—"There is no money." After being given the hypothetical that Mr. Frankl might find separate counsel for Abri to file a proof of claim if necessary, Ms. Boydston again admitted that Abri had a claim. According to her, though, the amount of the claim was no more than $1.3 million. She said: "We've done the full analysis, right, to figure out why and how much—if possible—Abri could possibly get if there was money, and it's $1.3 million."

79.     But she then advised Abri's board that pursuing the claim was pointless: "There is no possibility that there is going to be money. It's just not going to happen." According to her, there was no possibility of recovering cash because the Killeen Facilities "have never cash-flowed."

80.     For all these reasons, Ms. Boydston advised Abri's board that the small potential amount of a claim, when judged against the harm it could bring to Abri, was "not enough to jeopardize" the risks to the bankruptcy that Abri's claim filing could bring.

81.     In the end, Ms. Boydston's advice to Abri's board was clear: "I would not file a claim on behalf of Abri in these cases." As discussed below, Abri's board followed her advice, depriving Abri of its claim (whether worth $1.3 million or more) in the debtors' bankruptcy case.

82.     Most astonishing about Ms. Boydston's call, however, is how soon—and how explicitly—she would contradict her statements to Abri's board in filings and sworn statements made to the bankruptcy court.

83.     Five days after Ms. Boydston's call with Abri's board, Gutnicki caused the Killeen Entities to file supplemental documents required by the bankruptcy code.  The documents contained therein put the lie to Ms. Boydston's statements to Abri's board and reveal Gutnicki's lack of authority to file and proceed with the bankruptcy.

84.     Start with supplemental financial documents.  Despite Ms. Boydston claiming five days earlier to have done an "analysis" that showed that "none of these facilities cash flow, even on a good day," the Killeen Entities' consolidated financial statements for 2023 show cash on hand of $7.65 million and a net increase in cash of over $1.6 million.  Put simply, the facilities that Ms. Boydston adamantly claimed never "cash flowed" were not just generating cash, but more cash year-over-year.

85.     Ms. Boydston likewise asserted that Abri's claim was limited to $1.3 million.  Yet on the "Due From Facilities" line of the consolidated balance sheets, the Killeen Entities reported owing $4,453,428 back to Abri.  The Debtors' own financials therefore showed that Abri had a claim more than three times' larger than what Ms. Boydston reported to Abri's board.

86.     These supplemental documents also prove Gutnicki had no authority to file or pursue the Killeen Entities' bankruptcy.  Recall that the Abri board resolution supposedly authorizing the filing was premised on the Killeen Entities being subsidiaries of Abri.  But the supplemental documents showed that the debtors were ***not*** Abri's subsidiaries.

87.     Each of the federal tax returns for the Killeen Entities plainly showed they were not owned by Abri Health Services, LLC.  They were owned by completely different entities—Abri Care Group LLC and Affinity Care Group LLC:

| Internal Revenue Service | ▶ Go to www.irs.gov/Form1065 for the latest information. | | | | |
|---|---|---|---|---|---|
| **Name of partnership** | | | | | **Employer identification number** |
| PM MANAGEMENT - KILLEEN I NC LLC | | | | | 27-4643105 |
| **Part I   Entities Owning 50% or More of the Partnership** (Form 1065, Schedule B, Question 2a (Question 3a for 2009 through 2017)) | | | | | |
| Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions). | | | | | |
| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital | |
| ABRI CARE GROUP LLC | 86-3188639 | PARTNERSHIP | UNITED STATES | 50.00 | |
| AFFINITY CARE GROUP LLC | 92-3986983 | PARTNERSHIP | UNITED STATES | 50.00 | |

88.     At this point, Ms. Boydston must have known the Abri board resolution was no authority at all.  The Killeen Entities were clearly not subsidiaries of Abri, as she had originally represented to the bankruptcy court.  If the Killeen Entities were to file bankruptcy, Gutnicki would have to be engaged—and the bankruptcy filing would have had to be authorized—by Abri Care Group LLC and Affinity Care Group LLC.  Neither of these entities is a subsidiary of Abri. And none are managed or represented by Abri's board.  The bankruptcy filing that Gutnicki conceived, implemented, and remained intent on pursuing, was never properly authorized in the first place.

89.     Nevertheless, Ms. Boydston signed a declaration under penalty of perjury two weeks later in support of the debtors' motion to employ Gutnicki in its pursuit of an unauthorized bankruptcy.  Her declaration was materially false in several respects.

90.     *First*, it omitted that Gutnicki had an ongoing professional relationship with Mr. Frankl, who indirectly managed Abri.

91.      *Second*, it omitted that Gutnicki, through the Frankl Engagement Agreement, had an ongoing professional relationship with MR Acquisition, the company formed by Mr. Frankl that had executed the Finch LOI for the Finch Facilities.   This omission is gobsmacking, considering that receivership litigation with this very landlord supposedly "forced" the Killeen Facilities into bankruptcy and constituted most of the alleged debt owed by the debtors.

92.      What's more, Gutnicki's representation of MR Acquisition was directly relevant to the question of how much the landlord was owed.  After enforcing the landlord's promise to reduce the rent of the Killeen Facilities, the landlord was owed much less than he claimed in the receivership.  As calculated above, the landlord was owed less than $500,000, which further demonstrates the absurdity of a bankruptcy filing.

93.      *Third*, Ms. Boydston's declaration omitted that Gutnicki represented Marvin Rubin pursuant to the Frankl Engagement Agreement.  Mr. Rubin had provided a retainer of $250,000 to Gutnicki, yet Ms. Boydston told the court that he was not interested in the outcome of the bankruptcy case.

94.      *Fourth*, Ms. Boydston falsely claimed that Gutnicki had waived a claim to over $39,000 in fees for work done on the MR Acquisition matter to clear conflicts and represent the Killeen Entities in bankruptcy.   Not so.   Starting in May 2024 and continuing through January 2026, Gutnicki has emailed Mr. Frankl (and Mr. Rubin) nearly every month asking for payment of this amount—and more—for work done for MR Acquisition on the Finch Facilities matter.

95.      *Fifth*, Ms. Boydston claimed that Gutnicki had no conflict of interest since, as of January 12, 2024, Gutnicki was no longer working for Abri.  This was plainly false.  Starting on January 15, 2024, when Gutnicki sent the "make-up" email to Mr. Frankl, Gutnicki was working

to continue its relationship with Abri.  Then, in her early February call with Abri's board, Gutnicki

not only stated it was working (and would work) for Abri on other matters, but Ms. Boydston made

clear that the purpose of the bankruptcy was to ensure that "Abri" wouldn't "be fucked."

96.     After having made her sworn declaration to the Court, Ms. Boydston and Gutnicki

started backing away from Mr. Frankl, MR Acquisition, and Abri—all to try to appear unconflicted

before the bankruptcy court.

97.     For example, during February 2024, one of Abri's board members, Mr. Diamond,

suggested that resolve the alleged conflict of interest from Mr. O'Halloran serving as CRO both

of Abri and the Killeen Entities.  Mr. Diamond proposed that he would become Abri's CRO, while

Mr. O'Halloran would remain as the CRO of only the debtors (*i.e.*, the Killeen Entities).

Ms. Boydston refused, advised Abri's board that this should not be done, and instead installed an

"independent manager" over the Killeen Entities.  Incredibly, Ms. Boydston took these steps even

though Abri's board was purportedly Gutnicki's ultimate client representative.

98.     It was soon clear to Abri's board that Gutnicki and Ms. Boydston weren't listening

to them—she was listening to Kevin O'Halloran only.  But after roughly fifteen days of the

bankruptcy, Abri's board had become frustrated with CRO Kevin O'Halloran.  He wasn't giving

information to the board.  He wasn't listening to the board.  And he was instructing Gutnicki's

actions, even though Mr. O'Halloran—and, of course, Gutnicki—ultimately answered to Abri's

board.

99.     The board asked Mr. Frankl for help, and suggested he reach out to Mr. Kaye, given

his long-standing personal and professional relationship with him as the lead relationship partner

at Gutnicki.

100.     On March 13, 2024, Mr. Frankl reached out to Mr. Kaye via WhatsApp.  Mr. Frankl told Mr. Kaye that speaking soon was an urgent matter: "Just to clarify the urgency, this is a very complicated situation, which is about to get even more complicated, and important that you['re] fully updated asap.  T[hank]Y[ou]."

101.     When the two spoke on the phone the next day, Mr. Kaye told Mr. Frankl, "I'm glad you reached out."  They spoke for over an hour.  During this call, Mr. Frankl explained to Mr. Kaye the problems with Mr. O'Halloran and Ms. Boydston, and scheduled an in-person meeting, where Mr. Frankl would fly to Chicago to meet Mr. Kaye at Gutnicki's home office in Skokie.

102.     Mr. Frankl's concerns about Ms. Boydston are confirmed in his WhatsApp messages to Mr. Kaye:

> Frankl: I'm panicking that Liz shouldn't tell Kevin about any of this PLEASE!!  It will absolutely backfire on me.
>
> Kaye: i will tell her not to
>
> Frankl: Thank you-it's absolutely crucial and I hope not too late.

103.     Mr. Frankl scheduled to meet with Mr. Kaye in person about a week later, on March 21, 2024.  Mr. Frankl met with Mr. Kaye for several hours at his office in Skokie, Illinois.  Upon information and belief, Gutnicki billed Mr. Frankl for this meeting.

104.     At this meeting, Mr. Frankl re-iterated to Mr. Kaye his concerns about Mr. O'Halloran and Ms. Boydston's apparent allegiance to Mr. O'Halloran.

105.     Mr. Kaye repeatedly reassured Mr. Frankl that he was Gutnicki's client, and that Mr. Kaye would help him.  He said reassuring things like: "I'm your friend."  "I'm here to help you."  "I'm here to help you in any way that I can."  Most importantly, he made clear that Gutnicki believed that Mr. Frankl was its client.  He said, in no uncertain terms: "You, Abraham Frankl and

Marvin Rubin individually are the firm's clients." He made clear that while Gutnicki represented other companies or entities, those entities were only Gutnicki clients because of Mr. Frankl—the ultimate client. He stressed Gutnicki's view that Mr. Frankl was ultimately the firm's client by pointing out that the firm considered him responsible for Gutnicki's invoices.

106. Hearing this from Mr. Kaye made Mr. Frankl hopeful, as he and Abri's board were concerned that Gutnicki (especially Ms. Boydston) had resorted to taking instructions from Mr. O'Halloran, ignoring the board and the directives of the equity holders.

107. In response to Mr. Kaye's reassurances that Mr. Frankl was Gutnicki's client, Mr. Frankl expressly disclosed that he and Abri's board did not trust Ms. Boydston. Mr. Kaye's response suggested he believed Mr. Frankl's concern was ridiculous—how could Mr. Frankl not trust a Gutnicki partner? According to Mr. Kaye: "You're the client. She [Ms. Boydston] knows you're the client. Gutnicki considers you to be the primary client and will always do what's in your best interest. And Liz would never think of doing something that's again your best interests."

108. Mr. Frankl was still worried, however, that Ms. Boydston might share the board's concerns about Mr. O'Halloran with the CRO. Mr. Kaye again assured Mr. Frankl that this would not happen—Mr. Kaye would speak with Ms. Boydston, their conversations would be privileged and confidential, and Mr. Frankl had nothing to worry about. Mr. Kaye also told Mr. Frankl that he would re-focus on the bankruptcy matter, and that the best path forward would be an in-person meeting with Mr. Kaye, Ms. Boydston, and Mr. Frankl.

109. Despite these positive statements from Mr. Kaye, Gutnicki nevertheless abandoned one of its clients, MR Acquisition. During this meeting with Mr. Frankl, he and Mr. Kaye discussed that the Finch landlord should not have any claim against the Killeen Facilities (or their claim should be substantially reduced) because the Finch LOI enshrined a promise to sell the

facilities to MR Acquisition. Mr. Kaye agreed. Mr. Frankl expressed strongly that MR Acquisition should sue the Finch Facilities for specific performance—*i.e.*, to force them to complete the deal and sell the Killeen Facilities to MR Acquisition. Mr. Kaye agreed that this was a very good idea and the best immediate option. Mr. Frankl responded: "Great! Start drafting" the lawsuit. Mr. Kaye refused. He claimed that Gutnicki had a conflict of interest because it now represented the Killeen Facilities in bankruptcy. As a result, Mr. Kaye claimed, Gutnicki could not be litigation counsel to enforce the deal it had negotiated for MR Acquisition.

110. This surprise announcement of an alleged conflict did not comport with the Frankl Engagement Agreement or the applicable ethics rules. For starters, Gutnicki did not give written notice that it could no longer represent MR Acquisition in its negotiations and disputes with the Finch Facilities. What's more, Gutnicki's actions amounted to a violation of the "hot potato" rule—Gutnicki had dropped an existing client (MR Acquisition), without disclosing that fact to the client, so it could take on the more lucrative representation of a new client (the Killeen Facilities) in the related bankruptcy matter.

111. The day after this March meeting, Mr. Frankl again informed Mr. Kaye that Gutnicki might be abandoning another one of its clients, Abri. By WhatsApp message, Mr. Frankl relayed a message from Abri's board about a call with a Gutnicki bankruptcy lawyer (Max Schlan) and Kevin O'Halloran. Mr. Frankl wrote: "The position seems to be very docile – debtors are not pushing back at [F]inch for any reduction of the outstanding rents – Kevin is against asserting any Abri claims against Killeen." That is, by late March 2024, Gutnicki and Mr. O'Halloran were taking the same position Ms. Boydston had on the call from early February: although Abri unquestionably had a claim to assert in the Killeen Entities' bankruptcy, it should not assert it. Still, Mr. Kaye did nothing.

112.     Despite agreeing on March 21 that Mr. Kaye, Ms. Boydston, and Mr. Frankl should meet in person, no in-person meeting occurred.  Instead, Mr. Kaye eventually scheduled a call between him and Ms. Boydston for Gutnicki and Mr. Frankl.  This call occurred on April 16, 2024, at around 1:10 P.M. Eastern Time.  The call was immediately contentious.

113.     Mr. Frankl began by asking Ms. Boydston if she considered the conversation privileged.  She said no.  When asked why, Ms. Boydston told Mr. Frankl because "you are not my client."  Of course, this was very different than what Gutnicki  had told Abri's board in early February 2024; at that time, Gutnicki not only wanted to represent Abri in any matter unrelated to the Killeen Entities bankruptcy but also told the board that the purpose of their representation in the bankruptcy was to protect Abri.  Otherwise, Ms. Boydston memorably said, "Abri is going to be fucked."  It was also the exact opposite than what Mr. Kaye had told Mr. Frankl on March 21, 2024—that Gutnicki considered him to be the firm's ultimate client.

114.     Floored by Ms. Boydston's statement, Mr. Frankl asked her: "Then who is the client?"  Ms. Boydston responded: "The debtor entities."  To which Mr. Frankl asked: "Then who do you answer to?"  Again, Ms. Boydston responded: "The debtor entities."  Frustrated, Mr. Frankl asked: "But who controls the debtor entities?  Do you answer to the board?"  Incredibly, Ms. Boydston said: "No.  I don't answer to the board."

115.     Wanting to get to the bottom of this, Mr. Frankl kept pushing.  He asked Ms. Boydston: "So do you answer to Kevin [O'Halloran, the CRO]?"  Ms. Boydston said: "No, I don't answer to Kevin."

116.     Mr. Frankl then asked: "Who do you answer to?"  Ms. Boydston responded: "I answer to Kevin O'Halloran, who answers to Marvin Rubin, who is the majority shareholder."

That statement was plainly false, as Mr. Frankl knew.  So, he asked Ms. Boydston: "Who told you that?"

117.    Amazingly, Mr. Kaye never spoke up.  He never spoke up to tell Ms. Boydston that, during his March 2024 meeting with Mr. Frankl, Mr. Kaye told Mr. Frankl that he was Gutnicki's ultimate client.

118.    Because of Mr. Kaye's silence, and to dispel Ms. Boydston's incorrect belief, Mr. Frankl started frantically sending WhatsApp messages to Mr. Kaye in real-time showing that Ms. Boydston's understanding of who owned Abri was fundamentally wrong.  For starters, he shared that Marvin Rubin was not the majority owner of Abri.  There was no majority owner of Abri.  Like the debtor entities, Abri's ownership was equally split between Abri Care Group LLC and Affinity Care Group LLC—but Abri Care Group was the manager of Abri.  Abri Care Group, in turn, was managed by its manager, Abri Holdings LLC.  And Mr. Frankl is the manager of Abri Holdings—all facts that Mr. Frankl soon proved to Mr. Kaye by sending him the controlling ownership charts and operating documents for all the entities.

119.    Again, though, Mr. Kaye refused to speak up and inform Ms. Boydston that she was wrong about who was Gutnicki's ultimate client.  As a result, Ms. Boydston continued to tell Mr. Frankl: "I answer to Kevin O'Halloran, who answers to Marvin Rubin."  Since Ms. Boydston continued to insist that Marvin Rubin was her ultimate client, Mr. Frankl began asking her simple questions.  He asked Ms. Boydston if she had ever received a message that was directly communicated by Marvin Rubin, instead of through Kevin O'Halloran.  Ms. Boydston said no. To drive the point home further, he asked Ms. Boydston if she had ever received a call, email, or text message from Marvin Rubin.  She admitted she had not.  Mr. Frankl then sarcastically asked

Ms. Boydston—"Then how do you know he even exists?"  Mr. Frankl then asked similar questions

of Mr. Kaye: had he ever communicated with Marvin Rubin directly?  Again, the answer was no.

120.    At this point, Mr. Frankl stated that he did not want to talk with Ms. Boydston if

she did not consider it a confidential communication.  He asked Mr. Kaye if this was a confidential

communication.  Again, Mr. Kaye would not commit that he and Ms. Boydston would keep the

conversation confidential from Mr. O'Halloran—which was a complete reversal from what

Mr. Kaye had told Mr. Frankl in March.

121.    Mr. Frankl then advised Ms. Boydston that, as discussed with and endorsed by

Mr. Kaye during and since their March 2024 meeting, MR Acquisition would soon be suing the

landlord of the Finch Facilities in state court to enforce and compel specific performance of the

Finch LOI.  Ms. Boydston was apoplectic.  She asked Mr. Frankl to wait until after the expected

confirmation of the bankruptcy plan in early May 2024.  She again advised someone she claimed

wasn't her client (Mr. Frankl) that this lawsuit was not in his best interests.  Her objections were

so strenuous that Mr. Frankl asked her why she was so opposed to this lawsuit.  Her exact response

was: "Because if you file now, before plan confirmation, Gutnicki will get fucked and potentially

lose $500,000."  Shockingly, Mr. Kaye remained silent during and after Ms. Boydston's objections

to a lawsuit he had already endorsed—and that Gutnicki would have filed—if it hadn't dropped

MR Acquisition as a client.

122.    The call ended shortly thereafter as it was clear Gutnicki had breached its promise

that Mr. Frankl and his entities were the firm's ultimate client.  Ms. Boydston believed she

answered to a man she'd never met or spoken to, who wasn't the majority shareholder or manager

of the company, and whose supposed commands were relayed through an intermediary with whom

her actual client was dissatisfied.  And Mr. Kaye refused to speak up for Mr. Frankl, the man he

claimed less a month prior was Gutnicki's ultimate client.  At this point, it made little sense for Mr. Frankl to continue talking with Gutnicki.  And there was little he could do.  Within weeks, the Killeen Entities' bankruptcy case would end, with a confirmed plan of reorganization and a liquidation trust.

### E.     The Bankruptcy Ends, But Gutnicki's Greed Continues.

123.     On April 29, 2024, the Killeen Entities' plan for reorganization was confirmed and a liquidation trust established.  That is, the Killeen Entities went into bankruptcy with more than enough cash to pay their creditors, and came out with unpaid creditors, now reliant on future lawsuits to be brought by a liquidation trust.  For Gutnicki, this was a job well done, for which the firm earned well over $600,000.

124.     Starting just days after the bankruptcy concluded, Gutnicki's greed escalated even further.  On May 1, 2024, Ms. Boydston, working with her friend Mr. O'Halloran, had Abri assign its office lease in North Dallas to Gutnicki, with an effective date of July 1, 2024.  Of course, this purported transaction had its own conflicts of interest, as a lawyer cannot enter into a business transaction with a client except under circumstances not present here.  *See, e.g.*, TEX. R. PROF'L CONDUCT 1.08(a).  Again, there is an authority issue—Mr. O'Halloran was Abri's CRO; he did not have authority to assign the company's real estate to its lawyers.  And Abri's lease forbade any assignment without the consent of Abri's landlord, which had not been obtained.  But Ms. Boydston signed the assignment for Gutnicki anyway.

125.     On May 22, 2024, Mr. Frankl notified Mr. Kaye of changes that were being made to the corporate management of Abri.  That same day, Gutnicki sent Mr. Frankl a series of open invoices for its various matters (including the MR Acquisition matter for the Finch Facilities).  These invoices include the over $39,000 that Ms. Boydston had sworn under oath had been waived

to allow Gutnicki to clear conflicts and represent the Killeen Entities.  For the five months that the Killeen Entities were in bankruptcy, Gutnicki swore the invoices were gone.  But once the bankruptcy was over, Gutnicki started trying to collect them again—from Mr. Frankl.

126.   Worse still, the invoices had increased.  Gutnicki had billed Mr. Frankl for legal work done on the Finch Facilities and two other entities during March 2024.  Upon information and belief, these invoices concern Gutnicki bills related to the bankruptcy proceedings and MR Acquisition's request that Gutnicki file suit to enforce the Finch LOI.

127.   At the time of these communications, the bankruptcy court had not yet decided whether Gutnicki's conflicts of interest would bar it from receiving fees in the Killeen Entities' bankruptcy case.  Despite now attempting to collect fees from these affiliated companies, Gutnicki never corrected its false disclosures to the bankruptcy court.

128.   On June 4, 2024, Ms. Boydston attempted to enforce the alleged lease assignment in Gutnicki's favor.  She and her team marched into Abri's offices unannounced, delivered the alleged assignment to Abri's office manager, claimed the office was now to be shared with (and transitioned over to) Gutnicki, and proceeded to use Abri's conference for a lengthy meeting about non-Abri business.  No one at Abri had ever heard of this assignment before; many doubted that it was even real.  Abri's outside counsel therefore wrote to Gutnicki and Ms. Boydston that it could not recognize the lease assignment for the reasons discussed above.  She responded ninety minutes later: "What an absolute waste of your legal skills and hours."  But Gutnicki never attempted to enforce the invalid lease assignment.

129.   On November 19, 2024, the bankruptcy court awarded Gutnicki almost $665,000 in fees and expenses.  The court reduced Gutnicki's fees by over $200,000 based on the firm's conflicts of interest and questionable advice.  Some highlights include:

- Noting that the Debtors' pre-petition debt was only $6.3 million, with $5 million owed to the Landlord, when the assets of the company appeared to greatly exceed that number.

- Questioning the entire purpose of bankruptcy—"***Why, then, were they fighting the Hill Country Receivership?***" (emphasis in original).

- Noting the nonsensical failure of Abri filing a claim in the Killeen Entities case—"Abri was owed $1.3 million by the Debtors, but Mr. O'Halloran announced Abri would not seek a claim for it.  Why—it's not as though Abri was itself in bankruptcy and this would be an intercompany claim among debtors?"

- And noting that despite Gutnicki's claim that Abri would engage conflicts counsel to assert claims in the debtors' case—"no firm has ever filed a notice of appearance for Abri in these Sub V cases."

130.    At the same time, though, the bankruptcy court's order made clear that its award of any fees to Gutnicki was premised on declarations by Ms. Boydston that are demonstrably false.

131.    For example, the court relied on Ms. Boydston's representation that the over $39,000 in fees that Gutnicki allegedly waived arose from "legal services" provided "to the Debtors."  Of course, that is false.  Those "legal services" were provided to MR Acquisition—a non-debtor entity whose very existence was never disclosed to the bankruptcy court—and then billed to Mr. Frankl.  Nor were the fees waived.  Gutnicki began seeking them from Mr. Frankl again as soon as the bankruptcy case concluded.  Since the end of the bankruptcy, Gutnicki has sent nearly a dozen identical emails seeking payment of these allegedly "waived" invoices.

132.    The bankruptcy court likewise relied on Ms. Boydston's sworn statement that Gutnicki's representation "of any Abri entity should be deemed concluded and disengaged" as of January 12, 2024, because "no funds were available for payment on outstanding invoices."  Again, this is plainly false.  On February 8, 2024, on a recorded telephone call, Gutnicki—both through Ms. Boydston and Mr. Kaye—told Abri's board that it can and will represent Abri in other matters, just not those adverse to the debtors.  But even then, Ms. Boydston proceeded to give about an hour's worth of advice to Abri's board on how to navigate the bankruptcy so that Abri doesn't get

"fucked." Part of her advice included Abri not filing a proof of claim and forfeiting its multi-million-dollar claim against the debtors—advice that Abri's board unfortunately followed.

133. The bankruptcy court similarly relied on Ms. Boydston's supplemental sworn statement that "special counsel would be brought in to represent Abri if any conflicts were to arise." This also never happened. Gutnicki did not bring in special counsel to Abri, even though there were conflicts galore. Gutnicki simply continued to tell Mr. Frankl that he was the client, and they would act in his best interests, even when they plainly did not.

134. The bankruptcy court's order is a stern indictment of Gutnicki's conflicts and bankruptcy practice. Most lawyers would be chastened by such an order. Ms. Boydston was not.

135. Just two weeks after the bankruptcy court's order, Ms. Boydston emailed a member of Abri's finance department: "Hi Michael, hope you've had fun trips since Champagne! Since it's year end, I'm resending these invoices from January to request Abri to pay them. Thank you, Liz." The attached invoices, totaling over $350,000, included the Abri invoices that Ms. Boydston had sworn to the bankruptcy court Abri could not pay. They also included the MR Acquisition invoices that Ms. Boydston had sworn Gutnicki had waived. But it was year-end for a law firm partner, and her compensation depended on collections, so collect she must, sworn statements to a court notwithstanding.

### F.   Post-Script: Gutnicki and Ms. Boydston Part Ways.

136. Gutnicki's new bankruptcy department didn't last long. In late 2024, Gutnicki took a $200,000 loss on the bankruptcy Ms. Boydston pushed for the Killeen Entities. Around the same time, Ms. Boydston had to voluntarily cut Gutnicki's fees in a different bankruptcy case (Tommy's Boats) by another $250,000 because she once again flubbed basic conflicts of interest principles, concealed the source of a retainer paid to Gutnicki, and pushed a bankruptcy of questionable value.

Then, in late 2025, Gutnicki took another $250,000 loss on another of Ms. Boydston's bankruptcy cases (Remarkable Health Care).  In that case, the bankruptcy court found that Ms. Boydston and Gutnicki had "overworked" the case, "even considering" the firm's "voluntary" fee write-offs, because Gutnicki could not "show" that its representation "provided any benefit to [the debtors'] estates."

137.    Although discovery will be necessary to confirm exactly why, Gutnicki and Ms. Boydston parted ways at the end of December 2025.

138.    Two weeks later, Gutnicki tried to collect the invoices Ms. Boydston swore the firm had waived.  On January 16, 2026, at roughly 1:40 P.M., Gutnicki once again emailed Mr. Frankl asking for "prompt payment" of these "past due" invoices—invoices Ms. Boydston swore under oath had been waived, that were billed to an entity Gutnicki never disclosed, about a transaction Gutnicki refused to enforce, and the failure of which prompted Ms. Boydston's disastrous bankruptcy play.  This lawsuit was prepared shortly after Mr. Frankl received Gutnicki's most recent invoice.

## V.    FIRST CAUSE OF ACTION – LEGAL MALPRACTICE
### (AGAINST ALL DEFENDANTS)

139.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

140.    Plaintiffs were Defendants' clients.  Defendants are a law firm and lawyers.  An attorney-client relationship therefore existed between Plaintiffs and Defendants, which gave rise to a standard of care owed by Defendants to Plaintiffs.

141.    Defendants breached the standard of care by failing to act as a reasonably prudent attorney would have under similar circumstances.  The details of Defendants' wrongdoing are set forth above.

142.     Defendants' breaches proximately caused injuries to Plaintiffs.  Those injuries include but are not limited to: (a) depriving Plaintiffs of their ability to recover millions from the Killeen Entities; (b) depriving Plaintiffs of their ability to acquire the real estate of the Finch Facilities from the landlord; and (c) causing Plaintiffs to incur unreasonable and unnecessary attorneys' fees to mitigate or remedy to Defendants' malpractice.

143.     Defendants' actions were the direct result of intentional and willful conduct. Defendants' breaches were also the result of fraud and gross negligence.  Plaintiffs are therefore entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003.

144.     Plaintiffs seek an amount of damages to be proved at trial by jury, but in no event less than $1 million.

## VI.   SECOND CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS)

145.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

146.     Plaintiffs were Defendants' clients.  Defendants are a law firm and lawyers.  An attorney-client relationship therefore existed between Plaintiffs and Defendants, which gave rise to a fiduciary duty owed by Defendants to Plaintiffs.

147.     Defendants breached their fiduciary duty to Plaintiffs, including without limitation the duty of candor and the duty of loyalty.  The details of Defendants' wrongdoing are set forth above.

148.     Defendants' breaches proximately caused injuries to Plaintiffs.  Those injuries include but are not limited to: (a) depriving Plaintiffs of their ability to recover millions from the Killeen Entities; (b) depriving Plaintiffs of their ability to acquire the real estate of the Finch Facilities from the landlord; and (c) causing Plaintiffs to incur unreasonable and unnecessary attorneys' fees to mitigate or remedy to Defendants' malpractice.

149.    Defendants' actions were the direct result of intentional and willful conduct. Defendants' breaches were also the result of fraud and gross negligence.  Plaintiffs are therefore entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003.

150.    Plaintiffs seek an amount of damages to be proved at trial by jury, but in no event less than $1 million.

## VII.   THIRD CAUSE OF ACTION – NEGLIGENCE AND GROSS NEGLIGENCE (BY SHERYL FRANKL, ABRI CARE GROUP, AND AFFINITY CARE GROUP AGAINST ALL DEFENDANTS)

151.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

152.    Defendants owed a legal duty to Sheryl Frankl, Abri Care Group, Affinity Care Group to not claim they represented and were authorized to file pleadings, proceedings, and bankruptcy cases on behalf of individuals and entities they do not represent.

153.    Defendants breached their legal duty by filing and continuing to pursue a bankruptcy proceeding of the Killeen Entities owned by Abri Care Group and Affinity Care Group without authority of Killeen Entities' owners.

154.    This breach was gross negligence.  A lawyer has a duty to know the identity of their client.   And when a lawyer learn they have misidentified their client, they cannot pursue a proceeding on behalf of someone they do not represent.

155.    This breach caused damages to the Killeen Entities' owners by wiping out the value of the business prior to bankruptcy.

156.    Defendants' actions were the direct result of intentional and willful conduct. Defendants' breaches were also the result of fraud and gross negligence.  Plaintiffs are therefore entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003.

157.    Plaintiffs seek an amount of damages to be proved at trial by jury, but in no event less than $1 million.

## VIII.   FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION
### (BY SHERYL FRANKL, ABRI CARE GROUP, AND AFFINITY CARE GROUP AGAINST ALL DEFENDANTS)

158.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

159.   Defendants made representation to the Plaintiffs in the course of Gutnicki's business or in a transaction in which Gutnicki had a pecuniary interest—*i.e.*, the bankruptcy case in which Gutnicki was seeking the payment of legal fees.

160.   Defendants also supplied false information for the guidance of others including, without limitation, their statements to Abri's board and Mr. Frankl.

161.   Defendants did not use reasonable care in obtaining or communicating the information.

162.   Plaintiffs justifiably relied on Defendants' representations.

163.   Defendants' negligent misrepresentation proximately caused injury to Plaintiffs by wiping out the value of the business prior to bankruptcy.

164.   Defendants' actions were the direct result of intentional and willful conduct. Defendants' breaches were also the result of fraud and gross negligence.  Plaintiffs are therefore entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003.

165.   Plaintiffs seek an amount of damages to be proved at trial by jury, but in no event less than $1 million.

## IX.   FIFTH CAUSE OF ACTION – TORTIOUS INTERFERE WITH CONTRACT
### (BY SHERYL FRANKL, ABRI CARE GROUP, AND AFFINITY CARE GROUP AGAINST ALL DEFENDANTS)

166.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

167.   Plaintiffs had valid contracts—namely, their contractual right to ownership of the Killeen Facilities.

168.     Defendants willfully and intentionally interfered with these contracts by exercising unauthorized control over the Killeen Facilities, including putting them into bankruptcy and continuing with bankruptcy proceedings even after learning their alleged authorization for filing was invalid.

169.     Defendants' interference proximately caused Plaintiffs' injury by wiping out the value of the business prior to bankruptcy.

170.     Defendants' actions were the direct result of intentional and willful conduct. Defendants' breaches were also the result of fraud and gross negligence.  Plaintiffs are therefore entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003.

171.     Plaintiffs seek an amount of damages to be proved at trial by jury, but in no event less than $1 million.

## X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court award it the following relief: judgment on their claims against the Defendants in an amount to be determined at trial; pre- and post-judgment interest; costs of suit, including reasonable and necessary attorneys' fees; and such other and further relief as the Court deems just and proper.

This 29th day of January 2026.

Respectfully submitted,

*/s/Andrew B. Ryan*
Andrew B. Ryan
State Bar Card No. 24054464
Sarah E. Long
Texas Bar No. 24143704
**RYAN LAW PARTNERS LLP**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
T: (214) 347-7377
F: (888) 594-6240
E: andy@ryanlawpartners.com
E: sarah@ryanlawpartners.com

***Attorneys for Plaintiffs***